# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| SEAGEN INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:20-CV-00337-JRG |
| | § | |
| DAIICHI SANKYO CO., LTD., | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Daiichi Sankyo Co., Ltd.'s ("DSC") Rule 12(b) Motion to Dismiss for Lack of Subject Matter Jurisdiction and Lack of Personal Jurisdiction (the "Motion to Dismiss") (Dkt. No. 22) and Motion to Transfer Under 28 U.S.C. § 1404 to the District of Delaware (the "Motion to Transfer"). Plaintiff Seagen Inc. ("Seagen") opposes both motions. For the reasons stated herein, both the Motion to Dismiss and the Motion to Transfer are **DENIED**.

## I. BACKGROUND

Plaintiff Seagen, a biotechnology company incorporated in Delaware and based in Washington State, was granted U.S. Patent No. 10,808,039 (the "'039 patent" or the "asserted patent") on October 20, 2020. (Complaint, Dkt. No. 1 at ¶ 6; U.S. Pat. No. 10,808,039). Two minutes after midnight (Eastern Time) on the issue date, Seagen filed this action for infringement against DSC, a Japanese pharmaceutical company incorporated under the laws of Japan. (Dkt. No. 1 at ¶ 7). The '039 patent is titled "Monomethylvaline Compounds Capable of Conjugation to Ligands" and is directed to certain antibody-drug conjugates. (*Id.* ¶ 17; '039 patent). Seagen alleges that DS-8201, a cancer drug manufactured by DSC and sold under the name Enhertu, infringes the '039 patent. (*Id.* at ¶¶ 21–29).

DSC has moved to dismiss this action under Fed. R. Civ. P. 12(b)(1) and 12(b)(2). It argues that Seagen's suit was filed prematurely, which would deprive the Court of subject-matter jurisdiction. DSC also argues that the Court cannot exercise personal jurisdiction over it. Separately, DSC has moved to transfer this case to the District of Delaware on the basis of convenience under 28 U.S.C. § 1404(a). The parties undertook substantial discovery on jurisdiction and venue, including a discovery dispute that required resolution by the Court. (Dkt. No. 81). Now, after careful consideration of the briefing, including the supplemental briefing, (Dkt. Nos. 22, 24, 66, 67, 69, 70, 76, 77, 99, 100, 103, 104, 105), and for the reasons stated herein, the Court is of the opinion that both motions should be **DENIED**.[1]

## II.     LEGAL STANDARDS

### A.     Subject-Matter Jurisdiction

A district court can, and in fact must, dismiss a civil action under Fed. R. Civ. P. 12(b)(1) if the court finds that it lacks constitutional or statutory subject-matter jurisdiction when the action was filed. "It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'" *Grupo Dataflux v. Atlas Global Grp.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance*, 9 Wheat. 537, 539 (1824)). In the context of patent infringement, there can be no jurisdiction if the patent-in-suit has not yet issued at the time the complaint was filed, even if the patent later issues. *See GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 483 (Fed. Cir. 1996).

---

[1] The Court is also aware of DSC's motions for a hearing (Dkt. Nos. 80, 113). In light of the extensive briefing, however, the Court is of the opinion that a hearing is unnecessary. Accordingly, the Court resolves these motions on the papers. *See* L.R. CV-7(g).

## B. Personal Jurisdiction

A federal district court has personal jurisdiction over a party if the party would be subject to personal jurisdiction in a court of general jurisdiction in the forum state. *See* Fed. R. Civ. P. 4(k)(1)(A). When a party is not a resident of that state, the exercise of personal jurisdiction must comport with both the state's "long-arm statute" and constitutional principles of due process. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). Federal Circuit law applies to determinations of personal jurisdiction "when a patent question exists." *Celgard, LLC v. SK Innovation Co., Ltd.*, 792 F.3d 1373, 1377 (Fed. Cir. 2015).

Due process requires that a party have sufficient minimum contacts with the forum state such that the exercise of jurisdiction would not offend traditional notions for fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In assessing whether due process is satisfied, the Federal Circuit considers: (1) whether the defendant purposefully directed its activities at residents of the forum state; (2) whether the claim arises out of or relates to those activities; and (3) whether the exercise of jurisdiction would be fair and reasonable. *Celgard*, 792 F.3d at 1377.

## C. Venue and Convenience

A foreign defendant may not challenge the propriety of venue in a United States District Court, but it may move to transfer for convenience under 28 U.S.C. § 1404(a). *In re Princeton Digital Image Corp.*, 496 F. App'x 73, 74 (Fed. Cir. 2012). Under the change-of-venue statute, "a district court may transfer any civil action to any other district or division where it might have been brought" for the purpose of convenience and in the interest of justice. 28 U.S.C. § 1404(a). To

prove that a suit "might have been brought" in the transferee forum, the movant must establish that the transferee forum would have subject matter jurisdiction, personal jurisdiction, and proper venue. *See Hoffman v. Blaski*, 363 U.S. 335, 343–44 (1960).

If the Court is satisfied that the action could have been initially brought in the transferee forum, the Court considers eight non-exclusive private- and public-interest factors to determine if transfer is warranted for convenience. *In re Volkswagen AG*, 371 F.3d 201, 202–03 (5th Cir. 2004) [*Volkswagen I*]; *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) [*Volkswagen II*]. The private interest factors are "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen II*, 545 F.3d at 315 (quoting *Volkswagen I*, 371 F.3d at 203). The public interest factors are "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.* (quoting *Volkswagen I*, 371 F.3d at 203) (alterations in original). The movant must "clearly demonstrate" that transferee forum would be "clearly more convenient" than the transferor forum in view of the eight *forum non conveniens* factors. *Id.* at 314–15.

## III.    DISCUSSION

The Court first addresses DSC's Motion to Dismiss and concludes, for the reasons stated herein, that it should be **DENIED**. The Court next reaches DSC's Motion to Transfer and concludes, as discussed herein, that it should also be **DENIED**.

### A.     Motion to Dismiss

#### 1.     Subject-Matter Jurisdiction

DSC first moves to dismiss this action arguing that Seagen filed its complaint before the '039 patent issued. If DSC is correct and Seagen's complaint is premature, the Court must dismiss Seagen's complaint for lack of subject-matter jurisdiction. However, the Court concludes otherwise and finds that it has subject-matter jurisdiction over Seagen's timely filed complaint.

On its face, the '039 patent issued from the U.S. Patent and Trademark Office (the "PTO") on October 20, 2020. Seagen filed its complaint at 12:02 a.m. Eastern Time on October 20, 2020, which is 11:02 p.m. Central Time on October 19, 2020. This Court is located in the Central Time zone. DSC argues that Seagen's complaint was filed in the Eastern District of Texas before the effective issue date. Seagen does not dispute the timing of this, but contends the patent had issued and the right to exclude accrued at the start of October 20, 2020 in the Eastern Time zone.

DSC relies on the Uniform Time Act ("UTA"), 15 U.S.C. §§ 260–267, which is the enabling statute for time zones. It argues that the UTA mandates that the applicable time zone for filing suit in East Texas is the Central Time zone. Thus, DSC argues, Seagen did not have the right to assert its patent in the Eastern District of Texas until the start of October 20, 2020 in the Central Time zone. (Dkt. No. 22 at 7–11).

The UTA provides:

Within the respective zones created under the authority of sections 261 to 264 of this title the standard time of the zone shall insofar as practicable (as determined by the Secretary of Transportation) govern the movement of all common carriers engaged in interstate or foreign commerce. In all statutes, orders, rules, and regulations relating to the time of performance of any act by any officer or department of the United States, whether in the legislative, executive, or judicial branches of the Government, or relating to the time within which any rights shall accrue or determine, or within which any act shall or shall not be performed by any person subject to the jurisdiction of the United States, it shall be understood and intended that the time shall insofar as practicable (as determined by the Secretary

of Transportation) be the United States standard time of the zone within which the act is to be performed.

15 U.S.C. § 262.

DSC argues that Section 262 of the UTA restricts when Seagen may file its complaint because it applies to "the time of performance of any act by any officer [of the] . . . judicial branch[]" and "the time within which any rights shall accrue or determine." (Dkt. No. 22 at 9). According to DSC, the "rights" that accrue are the rights to exclude others from use of a patented invention, which "begin[s] on the date on which the patent issues and end[s] 20 years from the date on which the application for the patent was filed in the United States." 35 U.S.C. § 154 (a)(2). DSC also contends that the ability for the Court to hear a patent claim—*i.e.*, the Court's subject-matter jurisdiction—is an "act" by the "judicial branch." (Dkt. No. 22 at 9–10).

Seagen responds that the UTA does not apply to patent rights. (Dkt. No. 67 at 18). It cites a prior decision of this Court, *NobelBiz, Inc. v. Global Connect, L.L.C.*, No. 6:13-cv-804, 2014 WL 12613389 (E.D. Tex. Feb. 26, 2014). In *NobelBiz*, the Court confronted similar facts and endorsed an "absolute time" approach, holding that nationwide patent rights vested at midnight Eastern Time on the date of issuance. *Id.* at *2. Seagen also argues that Section 262's references to the Secretary of Transportation and common carriers limits application of the UTA to those areas. (Dkt. No. 67 at 19).

DSC replies that Section 262's broad language covers "all statutes" within the enumerated categories, and thus encompasses the accrual of patent rights. (Dkt. No. 77 at 2–3). DSC also points out that the Court did not have the opportunity to pass on the UTA in *NobelBiz*. Had the Court considered the UTA, DSC argues, the Court would have reached a different result. (Dkt. No. 22 at 10–11).

The Court is not aware of any other authorities addressing whether patents are subject to the UTA. The Court agrees with DSC that Section 262 of the UTA applies to patent rights. However, the Court cannot agree with DSC that a patentee must wait to file suit in a district court until the issue date begins in that court's local time zone. Under a plain reading of Section 262 of the UTA, a patentee's right to exclude, and therefore the remedy of a civil action for infringement, accrues upon issuance of the patent in the Eastern Time zone.

### a.       The UTA Applies to Patent Rights

As an initial matter, Seagen's argument that Section 262 of the UTA applies only to common carriers and transportation regulations is unpersuasive. The UTA vests the Secretary of Transportation with regulatory authority over time zones. *See, e.g.*, 15 U.S.C. §§ 260 ("[T]he Secretary of Transportation is authorized and directed to foster and promote widespread and uniform adoption and observance of the same standard of time within and throughout each such standard time zone."); 261(a) ("The limits of each zone shall be defined by an order of the Secretary of Transportation, having regard for the convenience of commerce and the existing junction points and division points of common carriers engaged in interstate or foreign commerce, and any such order may be modified from time to time."). References to the Secretary of Transportation in Section 262 simply connect that section back to the other enabling statutes in the UTA.

Even though the first clause of Section 262 is written in terms of common carriers engaged in interstate commerce, the second clause is drafted broadly to encompass "all statutes, orders, rules, and regulations" implicating time in certain enumerated categories. To that end, in *Sunday v. Madigan*—a case cited by both Seagen and DSC—the Ninth Circuit held that Section 262 of the UTA governed the application of the Uniform Code of Military Justice to crimes committed

by servicemembers abroad. 301 F.2d 871, 875 (9th Cir. 1962). The Ninth Circuit noted that the UTA "manifests a general congressional intent that zoned variations in time shall be observed in determining the time when statutory rights or liabilities accrue." *Id.* at 874. This Court perceives no reason why Section 262 would not apply to patent rights if such rights fall within the statute's plain language. By its own terms, Section 262 of the UTA must apply to "all statutes, orders, rules, and regulations relating to the time of performance of any act by any officer or department of the United States . . . or relating to the time within which any rights shall accrue." 15 U.S.C. § 262.

Title 35 of the United States Code provides that "[p]atents shall be issued in the name of the United States of America, under the seal of the Patent and Trademark Office, and shall be signed by the Director or have his signature placed thereon and shall be recorded in the Patent and Trademark Office." 35 U.S.C. § 153. Once issued, "[e]very patent shall contain . . . a grant to the patentee . . . of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States." 35 U.S.C. § 154(a)(1). The same section provides that "such grant shall be for a term beginning on the date on which the patent issues[.]" 35 U.S.C. § 154(a)(1).

The issuance of a patent by the Director of the PTO in the name of the United States is an "act" by an officer and department of the United States. *See* 35 U.S.C. § 1(a) ("The United States Patent and Trademark Office is established as an agency of the United States, within the Department of Commerce."); 35 U.S.C. § 3(a)(1) ("The powers and duties of the United States Patent and Trademark Office shall be vested in an Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office . . . who shall be appointed by the President, by and with the advice and consent of the Senate."); *see also Buckley v. Valeo*, 424 U.S. 1, 126 (1976) ("[A]ny appointee exercising significant authority pursuant to the laws of

the United States is an 'Officer of the United States[.]'"); *cf. United States v. Arthrex*, No. 19-1434, 594 U.S. ___, slip op. at 19 (2021).

Likewise, the issue date of a patent determines when the patentee's "right" to exclude others "accrues." *See* 35 U.S.C. §§ 154(a)(2), 271(a).

Plainly, therefore, patent terms are subject to Section 262 of the UTA. The term begins when the patent issues, and the issue date both depends "on the time of performance of [an] act by [an] officer or department of the United States," and determines the "time within which . . . rights shall accrue."

### b.     Seagen's Complaint Was Timely Filed

Even under the UTA, however, the Court cannot agree with DSC's argument that a patentee must wait to file suit until midnight on the issue date in a court's local time zone. Section 262 states that for any applicable statutory acts and rights, "it shall be understood and intended that the time shall insofar as practicable . . . be the United States standard time of the *zone within which the act is to be performed*." 35 U.S.C. § 262 (emphasis added). With respect to patent terms, issuance of the patent is the "act" that is performed by an officer or department of the United States, and issuance of the patent is the "act" that causes rights to accrue. This act necessarily occurs in the Eastern Time zone because the PTO must, by law, "maintain its principal office in the metropolitan Washington, D.C., area, . . . for the purpose of carrying out its functions." 35 U.S.C. § 1(b). The PTO is headquartered in Alexandria, Virginia, which is in the Eastern Time zone as defined by the Secretary of Transportation's regulations. *See* 49 C.F.R. §§ 71.4, 71.5.

DSC appears at least to concede that the '039 patent "existed at all times following its issuance," but nonetheless contends that local time zones constrain the right "to enforce a patent in a particular location." (Dkt. No. 69 at 2). DSC also appears to argue that the exercise of

jurisdiction over a patent case is an "act" of an "officer" of the "judicial branch" within the meaning of Section 262. (Dkt. No. 69 at 3). The Court does not agree and is unaware of any authority that supports these propositions. The jurisdictional statutes for patent cases mention no acts; only that district courts shall "have" original jurisdiction over patent cases. *See* 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents"); *see also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Rather, it is an act of the plaintiff—the filing of a complaint—that commences a civil action. Fed. R. Civ. P. 3.

More sensible is the conclusion that the issuance of a patent in the Eastern Time zone gives the patentee nationwide rights to exclude others from making, using, selling, offering for sale, or importing the patented invention. This accords with the statutory language defining a patentee's rights, which are framed in terms of the United States. *See, e.g.*, 35 U.S.C. §§ 154(a)(1), 271(a). This also accords with the reality that a suit for patent infringement, regardless of where brought, allows a patentee to recover damages for *all* acts of infringement within the United States. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371–72 (Fed. Cir. 2013).

Patent infringement occurs when a person "makes, uses, offers to sell, or sells any patented invention, *within the United States* or imports *into the United States* any patented invention *during the term* of the patent." 35 U.S.C. § 271(a). The term begins when a patent issues. 35 U.S.C. § 154(a)(1). The remedy for patent infringement is a "civil action." 35 U.S.C. § 281. District courts have subject matter jurisdiction over civil actions arising under federal patent laws. 28 U.S.C. §§ 1332, 1338(a). It follows, therefore, that a patentee has the right to bring a civil action in federal

court to enforce a patent as early as the first act of infringement—*i.e.*, the first domestic use of the patented invention without the patentee's permission during the patent term. Since that term begins when the PTO issues a patent in Alexandria, Virginia, the patentee need not wait to file suit until the date changes in the locale of the district court.

To conclude otherwise, as DSC proposes, would lead to anomalous results. If a defendant who is only subject to suit in the District of Hawaii could practice a patented invention in Hawaii for five hours before the right to bring a civil action accrues, this would constitute acts of infringement for which there is no remedy. No matter how hypothetical, such an outcome is clearly inconsistent with the statutory rights granted by Congress to patentees. DSC's interpretation of Section 262 cannot lie.

Finally, the Court notes in passing, although the "absolute time" rule applied in *NobelBiz* and other cases does not necessarily control here, the correct interpretation of Section 262 of the UTA leads to the same result. *See NobelBiz*, 2014 WL 12613389, at *3; *see also Cerro Wire Inc. v. Southwire Co.*, 777 F. Supp. 2d 1334, 1337–38 (N.D. Ga. 2011).[2]

## c.  The Court Has Subject-Matter Jurisdiction

For these reasons, the Court holds that it has subject matter jurisdiction to hear civil actions for patent infringement at the time a patent issues in the Eastern Time zone. Seagen's complaint was timely filed, and the Court finds that it has subject-matter jurisdiction over this suit. Accordingly, DSC's Motion to Dismiss should be **DENIED** on this ground.

## 2.  Personal Jurisdiction

DSC next asks the Court to dismiss this suit for lack of personal jurisdiction. (Dkt. No. 22 at 11). DSC argues it does not have any contacts that would give rise to specific jurisdiction over

---

[2] However, a different result might have been reached if the PTO's statutory headquarters were located in the Central Time zone (*e.g.*, Plano, Texas) rather than the Eastern Time zone.

it for Seagen's infringement claims. (*Id.*). It contends that all sales of the accused product, Enhertu, are conducted by its United States subsidiary, Daiichi Sankyo Inc. ("DSI"), in partnership with AstraZeneca US ("AstraZeneca"). (*Id.* at 12–13). Neither DSI nor AstraZeneca are named as defendants in this action.

Seagen advances four theories of specific personal jurisdiction in its complaint and its briefing. (Dkt. No, 1 at ¶¶ 9–12; Dkt. No. 67 at 6–7). First, Seagen argues that DSC is subject to personal jurisdiction under a stream-of-commerce theory. (Dkt. No. 1 at ¶ 10; Dkt. No. 67 at 7). Second, Seagen argues that DSC's subsidiaries and business partners, including DSI and AstraZeneca, are agents of DSC such that their contacts with Texas are properly imputed to DSC. (Dkt. No. 1 at ¶ 11; Dkt. No. 67 at 7). Third, Seagen argues DSC is subject to personal jurisdiction as an indirect infringer for inducing infringement by others in Texas. (Dkt. No. 1 at ¶ 9; Dkt. No. 67 at 7); *see* 35 U.S.C. § 271(b). Fourth, and to the extent DSC is not subject to personal jurisdiction in any state, Seagen argues DSC has sufficient minimum contacts with the United States as a whole, and is therefore subject to personal jurisdiction under Fed. R. Civ. P. 4(k)(2). (Dkt. No. 1 at ¶ 12; Dkt. No. 67 at 7).

The Court ultimately concludes that DSC is subject to personal jurisdiction under a stream-of-commerce theory. Therefore, the Court denies the Motion to Dismiss on this ground and needs not address Seagen's alternate theories.

### a.    DSC Has Sufficient Minimum Contacts with Texas

Seagen alleges that DSC has sufficient minimum contacts with Texas under the stream-of-commerce doctrine. Two competing views of the stream-of-commerce doctrine originated in *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987). Justice Brennan, writing for himself and Justices White, Marshall, and Blackmun, opined that placing goods into

the stream of commerce alone was sufficient to give rise to personal jurisdiction. *Id.* at 117 (Brennan, J. concurring). Justice O'Connor, writing for herself, the Chief Justice, and Justices Powell and Scalia, could not endorse jurisdiction premised on the stream of commerce without "something more" indicating a purposeful targeting of the forum. *Id.* at 109–108 (O'Connor, J. plurality op.).

Nearly twenty-five years later, in *J. McIntyre Machinery, Ltd. v. Nicastro*, the Supreme Court was again asked to pass on steam-of-commerce jurisdiction. 564 U.S. 873 (2011). The petitioner, J. McIntyre, a United Kingdom company, had manufactured a machine that seriously injured the respondent in New Jersey. *Id.* at 878. J. McIntyre had sold the machine to an independent U.S. distributor, which brought the machine to New Jersey. *Id.* J. McIntyre did not itself sell or market machines in the United States, and there was no allegation that the distributor was under J. McIntyre's control. *Id.* While representatives of J. McIntyre had attended conferences in the United States, none of the conferences were in New Jersey. *Id.* Justice Kennedy, joined by the Chief Justice and Justices Scalia and Thomas, opined that stream of commerce without more was insufficient to give rise to personal jurisdiction. *Id.* at 882–83. Thus, while Justice Kennedy in *J. McIntyre* endorsed Justice O'Connor's view in *Asahi Metals*, neither opinion has carried a majority of the Supreme Court. It remains unresolved whether Justice Brennan's view ("stream of commerce" alone) or Justice O'Connor's view ("something more") controls, and the Courts of Appeals have divided on this question. *See, e.g.*, *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564–68 (Fed. Cir. 1994) (collecting cases).

On the facts presented in this case, the Court is persuaded that either test is satisfied. DSC undeniably places Enhertu in the stream of commerce, which ends in doctor's offices and oncology hospitals in Texas. DSC imports Enhertu through New York "delivery duty paid" and passes title

to DSI in Pennsylvania. (*See* Dkt. No. 61 at 7–8, 10–11; Dkt. No. 67-2 at 57:12–58:21). DSI stores, labels, and packages vials of Enhertu to prepare them for distribution. (Dkt. No. 24-3 at ¶ 3). DSI has agreements with several domestic distributors that govern the sale and distribution of Enhertu. (*Id.* at 14–15). These distributors distribute the drug throughout the United States, including Texas. (*E.g.*, Dkt. No. 62-2 at 65:2–24; 195:20–25; 207:8–209:15). Enhertu ultimately ends up being purchased by health care providers such as Texas Oncology and MD Anderson, who provide the drug to cancer patients in Texas. (Dkt. No. 67-3 at 91:7–9, 111:11–112:6; Dkt. No. 99-2 at 2).

DSC argues that Seagen cannot rely on this stream of commerce because Seagen has not identified any Texas-specific contacts. (Dkt. No. 22 at 15–16). Essentially, it contends that Seagen has not satisfied the "something more" test. The Court disagrees. First, DSC admitted in interrogatory responses that DSC (and not merely DSI) "was involved in clinical trials relating to the study of Enhertu® at The University of Texas M.D. Anderson Cancer Center and at The University of Texas Southwestern Medical Center." (Dkt. No. 67-6 at 19). Second, according to several press releases, DSC (and not merely DSI) presented its research on DS-8201 (later Enhertu) at the San Antonio Breast Cancer Symposium in 2017, 2018, 2019, and 2020. (Dkt. No. 67-10 at 2, 6, 11, 16).

These additional contacts take DSC's ties with the Texas beyond the case of products that fortuitously enter the state. Texas is a well-known national oncology hub. Clinical trials are an essential precursor to approval of a new drug by the Food & Drug Administration (FDA). Without the clinical trials, including those conducted in Texas, DSC and its affiliates would not have been permitted to sell Enhertu domestically—the very acts alleged by Seagen to infringe.

Likewise, DSC's repetitive presentation of its research at a Texas breast cancer symposium (held in four consecutive years) shows an effort to market the new drug to Texas doctors and

convince them of its safety and efficacy—such efforts would reasonably lead to more prescriptions issued, and thus, more sales in Texas. DSC then held its activities in Texas out to the public in the form of several press releases. Notably, DSC's 2020 press release—dated after this suit was filed and after the '039 patent issued—indicates that DS-8201 received FDA approval and, for the first time, refers to the drug under its trade name Enhertu. Unlike the manufacturer in *J. McIntyre*—who had attended conferences in the United States but not in New Jersey—DSC came to Texas repetitively and intentionally.

The Court is persuaded that DSC has sufficient minimum contacts with the State of Texas to warrant the exercise of personal jurisdiction. There is a clear nexus between DSC's clinical trials and research presentations in Texas and the ultimate presence of the accused products in Texas through the stream of commerce. These activities demonstrate an intentional targeting of Texas by DSC for its business activities, sufficient to satisfy either formulation of the stream-of-commerce test. DSC's contacts with Texas therefore evince a purposeful availment of the benefits of conducting business in Texas, such that it should reasonably anticipate being subject to its laws and the jurisdiction of its courts.

### b. Seagen's Claims Arise from and Relate to DSC's Texas Contacts

The Court is further persuaded that Seagen's claims for infringement arise from or relate to DSC's contacts with Texas. Seagen's infringement claims arise from DSC's placing of Enhertu into the stream of commerce because DSC's sales of an allegedly patent-practicing product are the very acts accused of infringement. *See* 35 U.S.C. § 271(a).

As to DSC's clinical trials and research presentations: even if Seagen's claims do not arise from these activities, Seagen's claims do relate to them. *Ford Motor Co. v. Montana 8th Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021). In *Ford*, a products liability case, the Supreme Court upheld

personal jurisdiction over an automobile manufacturer even though an independent dealership had brought the subject vehicles into the forum states. *Id.* at 1032. Justice Kagan, writing for a unanimous Court, found a strong relationship between the forum, the defendant, and the litigation because "Ford had systematically served a market in [the forum States] for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States." *Id.* at 1028.

DSC's activities in Texas relate to Seagen's infringement claims in much the same way. DSC conducted clinical trials in Texas hospitals and has, in each of the past four years, regularly presented its research to Texas doctors at a medical symposium in San Antonio. Much as an auto manufacturer uses billboards and television ads to market cars to drivers, a pharmaceutical manufacturer uses research publications and symposia to market new drugs to doctors. Ford established service centers in Montana and Minnesota in the hopes of building long-standing relationships with Montana and Minnesota drivers. DSC conducted clinical trials in Texas hospitals expecting to build trust with Texas doctors, who will look to their own institutions and colleagues as a measure of assurance. DSC systematically served the Texas medical community and its patients in relation to the very drug whose sales are accused of infringement.

### c.    The Exercise of Jurisdiction Is Fair, Just, and Reasonable

Finally, the Court finds no reason why the exercise of personal jurisdiction would contravene traditional notions of fair play and substantial justice. Other than general opposition to the application of a stream-of-commerce theory, DSC makes no claim in its briefing that the exercise of jurisdiction would be unfair, unjust, or unreasonable.

### d.    The Court Has Personal Jurisdiction over DSC

DSC chose to conduct clinical trials for Enhertu at Texas oncology hospitals. It presented its research on the drug to Texas doctors and scientists. The drug was approved based on these

activities. DSC then placed the drug in the stream of commerce, with Texas health care providers purchasing the drug and prescribing it to Texas patients. DSC cannot now claim a due process violation when Texas courts exercise jurisdiction over it for tort claims arising from and relating to these sales. For these reasons, the Court is persuaded that DSC's Motion to Dismiss for lack of personal jurisdiction should be **DENIED**.

### B.      Motion to Transfer

The Court next takes up DSC's Motion to Transfer, in which DSC seeks to transfer this action to the District of Delaware based upon convenience. The Court finds that DSC has failed to establish either that this action could have been brought in the District of Delaware or that the District of Delaware would be clearly more convenient.

### 1.      DSC Has Not Established that this District of Delaware Could Hear This Case

The first issue under § 1404(a) is whether the transferee forum would have original subject-matter jurisdiction, personal jurisdiction, and proper venue at the time of filing. It is always incumbent on the movant to establish that a case could have been initially brought in the transferee forum. *See Capella Photonics, Inc. v. Infinera Corp.*, 2021 WL 518478, at *4 (E.D. Tex. Feb. 10, 2021); *see also Volkswagen II*, 545 F.3d at 315 ("a *moving party* . . . must satisfy the statutory requirements and clearly demonstrate that a transfer is [for convenience]" (emphasis added)); *Humble Oil*, 321 F.2d 53, 56 (5th Cir. 1963) ("But, of course, *he who seeks the transfer* must show good cause." (emphasis added)). As a foreign entity, DSC cannot contest venue in the District of Delaware. However, DSC has not even attempted to establish that the District of Delaware would have personal jurisdiction over it.

The reason for this is apparent to the Court: as DSC is an entity based in Japan and incorporated under Japanese law, a concession of personal jurisdiction in Delaware would

undermine its argument that it is not subject to personal jurisdiction in Texas. The only Delaware contacts DSC raises in its Motion to Transfer are those of non-parties DSI and AstraZeneca. (Dkt. No. 24 at 1). Thus, for DSC to be subject to personal jurisdiction in Delaware, it would have to be under a long-arm theory similar to those raised by Seagen: stream-of-commerce, agency, indirect infringement, or Fed. R. Civ. P. 4(k)(2).

To be clear, the Court is not saying that stream-of-commerce jurisdiction over DSC is proper in Texas and improper in Delaware. Simply put—DSC has not presented any specific facts or analysis of personal jurisdiction in the Motion to Transfer. DSC bypassed the statutory inquiry without mention, resorting only to an analysis of the *forum non conveniens* factors. (Dkt. No. 24 at 7–8).

To the extent DSC might argue (though it didn't) that it consented to personal jurisdiction by filing actions for declaratory judgment against Seagen in the District of Delaware—the first for breach of contract in 2019, and the second for non-infringement of the '039 patent after this case was filed—neither is sufficient to establish personal jurisdiction. In general, consent to suit in one instance does not operate as a waiver of jurisdiction forevermore.[3] Moreover, a party seeking transfer cannot rely on its own consent to suit in the transferee forum because such would entirely read the threshold requirement out of § 1404(a). *See Hoffman*, 363 U.S. at 340 ("[T]he power of a District Court under § 1404(a) to transfer an action to another district is made to depend not upon the wish or waiver of the defendant"); *see also Capella Photonics*, 2021 WL 518478, at *4 ("[T]o shift this burden . . . would entirely obviate the 'where it might have been brought' language

---

[3] Notably, the first action in Delaware was a breach of contract action regarding assignment of patent rights, not an action for patent infringement. The second action in Delaware was filed after the above-captioned matter was filed in this Court, making this the first-filed case.

in § 1404(a). The movant is always unopposed to transfer, and the statute does not impose this same requirement on motions 'to which all parties have consented.'").

Ultimately, it is incumbent on the movant—not the Court—to conduct a searching inquiry into the jurisdiction of the transferee forum. Here, DSC has made no attempt at such an inquiry and has not shown to the Court that Seagen could have initially brought this action in the District of Delaware. For this reason, the Court concludes that it cannot transfer this action to the District of Delaware.

### 2. DSC Has Not Established That the District of Delaware is Clearly More Convenient

Even if transfer to the District of Delaware was permissible, the Court independently concludes that DSC has not established that convenience warrants transfer. The burden is on DSC to clearly establish, in view of the *forum non conveniens* factors, that the transferee forum is clearly more convenient than the transferor forum. After consideration of the relevant factors, it is the Court's opinion that DSC has not met this burden.

**Ease of Access to Sources of Proof.** The first private-interest factor considers ease of access to sources of documentary and other physical evidence. *See Volkswagen II*, 545 F.3d at 315. Despite technological advances in digitization and transmission of documents, physical location remains relevant. *See id.* at 316; *In re Genentech, Inc.*, 566 F.3d 1338, 1346 (Fed. Cir. 2009).

DSC argues that this factor strongly favors transfer because non-parties DSI and AstraZeneca are based in New Jersey and Delaware, and there are no relevant documents in Texas itself. (Dkt. No. 24 at 12–13). Seagen responds that most of the evidence in this case will come from Washington and Japan, where Seagen and DSC are respectively located. (Dkt. No. 66 at 10–11).

The Court finds that the first private factor weighs against transfer. DSC overemphasizes the relevance of third party DSI's evidence in Delaware without any regard to its own evidence in Japan. While evidence from third parties (such as subsidiaries) may be relevant to some issues (such as damages), "[i]n patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer." *Genentech*, 566 F.3d at 1345. Here, the accused infringer is DSC—not DSI. DSC represents that it manufactures and imports the accused product, with DSI and AstraZeneca handling marketing and distribution in the United States. (Dkt. No. 24 at 4–6). The Court therefore expects most evidence related to the central issue of infringement to come from DSC in Japan, not DSI and AstraZeneca in New Jersey and Delaware. Since Seagen's evidence is located in Washington, keeping this case in the Eastern District of Texas would be equally convenient for Seagen and third parties DSI and AstraZeneca. In contrast, a transfer to Delaware would simply shift any such inconvenience from those third parties to Seagen. This factor weighs against transfer.

**Availability of Compulsory Process.** The second private factor considers the Court's power to compel the attendance of witnesses. *Volkswagen II*, 545 F.3d at 316. Federal district courts have the absolute power to compel attendance of a trial, hearing, or deposition "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A). Federal district courts have trial subpoena power over a person "within the state where the person resides, is employed, or regularly transacts business in person, if the person . . . is a party or a party's officer; or . . . [if the person] is commanded to attend a trial and would not incur substantial expense." Fed. R. Civ. P. 45(c)(1)(B). As party witnesses almost invariably attend trial at the behest of their employers, *i.e.*, willingly, "[t]his factor is directed towards

unwilling third-party witnesses." *C&J Rent Servs., Inc. v. LEAM Drilling Sys., LLC*, No. 2:19-cv-00079, 2019 WL 3017379, at *3 (E.D. Tex. July 10, 2019).

DSC argues that this factor favors transfer because no witnesses are located within the deposition subpoena power of this Court but several DSI and AstraZeneca witnesses are located within 100 miles of the District of Delaware. (Dkt. No. 24 at 11–12). Seagen argues that this factor weighs against transfer because four distributors of Enhertu are located in Texas or within 100 miles of the Marshall courthouse, but only two are within the District of Delaware's subpoena power. (Dkt. No. 66 at 9–10).

The Court finds that the second private-interest factor weighs in favor of transfer, but only marginally. Seagen and DSC have each identified third parties who may have relevant testimony to give. On balance, however, the Court expects that testimony from DSI and AstraZeneca (within the subpoena power of the District of Delaware) may have a slightly higher likelihood of being relevant than that of the distributors, who are further downstream in the supply chain.

**Cost of Attendance for Witnesses.** The third private factor, which considers the conveniences for witnesses who attend willingly, has been described as the most important factor. *See Genentech*, 566 F.3d at 1343 (quoting *Neil Bros. Ltd. v. World Wide Lines, Inc.*, 425 F. Supp. 2d 325, 329 (E.D.N.Y. 2006)). Under the Fifth Circuit's "100-mile rule," when the distance between the transferor and proposed transferee venues exceeds 100 miles (as here), "the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Volkswagen I*, 371 F.3d at 201; *Genentech*, 566 F.3d at 1343.

DSC argues that several non-party witnesses from DSI and AstraZeneca are located in New Jersey, Delaware, and Maryland, and that trial in the District of Delaware would be significantly more convenient for them. (Dkt. No. 24 at 10–11). Yet, it argues that "for [Seagen]'s Seattle-based

witnesses, both Districts are equally accessible in terms of travel time." (*Id.*). Seagen responds that the Eastern District of Texas is equally convenient for its West Coast-based witnesses as for the East Coast-based third-party witnesses, but trial in Delaware would impose substantial inconvenience upon the Seagen witnesses. (Dkt. No. 66 at 6–7).

The Court finds this factor to weigh decidedly against transfer. The Court is perplexed by DSC's suggestion that travel from Delaware to Marshall would be a grave inconvenience to DSI and AstraZeneca witnesses, while Seagen's Seattle witnesses would experience equal convenience regardless of whether they must travel to Marshall or to Delaware. Transfer to the District of Delaware would nearly double the travel time and distance for Seagen witnesses while reducing the burden on DSI and AstraZeneca witnesses to a short car ride. The difference is marginal for DSC's Japanese witnesses. *See Genentech*, 566 F.3d at 1344. In effect, such a transfer would simply shift inconvenience from DSI and AstraZeneca witnesses to Seagen witnesses. This factor weighs heavily against transfer.

**All Other Practical Problems.** The fourth private factor considers practical problems with the transferor and transferee courts' ability and duty to adjudicate the case. This factor encompasses concerns rationally based on judicial economy. *Quest NetTech*, 2019 WL 6344267, at *6; *see also In re Vistaprint Ltd.*, 628 F.3d 1342, 1346 (Fed. Cir. 2010).

DSC cries foul over duplicative litigation and the risk of inconsistent decisions if this case is not transferred to the District of Delaware, where DSC's mirror-image declaratory action is pending. (Dkt. No. 24 at 8–9). Seagen urges the Court to disregard the Delaware declaratory action because it was filed later and "the duplication is of DSC's own making." (Dkt. No. 66 at 4–5).

The Court agrees with Seagen and resists DSC's attempt to conjure judicial economy. The risk of duplicative litigation and inconsistent decisions only exists because DSC *chose* to file an

identical lawsuit in Delaware *after* being sued in Texas. DSC's choice to do so is itself an act *against* judicial economy. In this scenario, absent compelling circumstances, the first-filed action is presumptively favored. *In re Nitro Fluids L.L.C.*, 978 F.3d 1308, 1311 (Fed. Cir. 2020). In fact, the District of Delaware has stayed the later-filed declaratory action in view of this case. (*See* Order, Dkt. No. 34, *Daiichi Sankyo Co. Ltd. v. Seagen, Inc.*, C.A. No. 20-1524-LPS (D. Del.)).

Moreover, a transfer to Delaware could result in delay and duplication of work already performed in this case. A trial date has been set. (*See* Dkt. No. 48). Discovery is already underway. (*See, e.g.*, Dkt. Nos. 68, 87, 111). The parties have engaged in the early stages of claim construction briefing. (Dkt. No. 85, 86, 96, 97). In contrast, the Delaware case is still in its infancy and is presently stayed. For these reasons, the Court is persuaded that this factor weighs materially against transfer.

**Administrative Difficulties and Court Congestion.** The first public-interest factor considers court congestion and the interest in a speedy resolution of claims. DSC argues that this factor is neutral because "[a] comparison of the median time to trial does not show a meaningfully preferable forum[.]" (Dkt. No. 24 at 15). Seagen argues this factor weighs against transfer because trial times are consistently several months faster in the Eastern District of Texas. (Dkt. No. 66 at 12).

The Court agrees with Seagen that this factor weighs against transfer. The statistical reports cited by DSC show that the median time from complaint to trial in civil matters for 2018, 2019, and 2020 was approximately 30 months in the District of Delaware. (Dkt. No. 24-8 at 3). In the Eastern District of Texas, the median time from complaint to trial was less than 20 months in each of those years. Additionally, this case is set for trial in April of 2022, which is less than 10 months

away. In contrast, the Delaware declaratory action has not even been scheduled. A transfer of this case would certainly involve substantial and material delay.

**Local Interest.** The second public-interest factor considers the interest of the local community in the case. "[J]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Volkswagen I*, 371 F.3d at 206.

DSC argues that the Delaware community has a strong interest in local adjudication of this dispute because DSI and AstraZeneca are incorporated in Delaware; AstraZeneca is headquartered in Delaware; and meetings of the committee comprising DSC, DSI, and AstraZeneca occurred in or near the District of Delaware. (Dkt. No. 24 at 14–15). Seagen argues that the Delaware community does not have a strong interest in this case because the acts relevant to this suit occurred in Washington State and Japan—not Delaware—and because the accused product is available nationally. (Dkt. No. 66).

The Court is persuaded that this factor is neutral. The accused product, Enhertu, is available nationwide. Third party AstraZeneca is headquartered in Delaware, but other third parties (such as three of the identified distributors) are located in Texas. Although DSI and AstraZeneca are incorporated under Delaware law, this fact is entitled to little weight (if any). *See In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1223–24 (Fed. Cir. 2011); *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 527–28 (1947) ("[C]orporations often obtain their charters from states where they no more than maintain an agent to comply with local requirements, while every other activity is conducted far from the chartering state. Place of corporate domicile in such circumstances might be entitled to little consideration under the doctrine of *forum non conveniens*, which resists formalization and looks to the realities that make for doing justice."). While some suit-related activities (such as corporate meetings) may have taken place in Delaware, other

activities (such as the clinical trials discussed *supra*) took place in Texas. The Court is not persuaded that the Delaware community has a materially stronger interest in this suit than does that of the Eastern District of Texas.

**Familiarity with Governing Law.** DSC and Seagen agree the third public-interest factor is neutral. (Dkt. No. 24 at 15; Dkt. No. 66 at 13).

**Conflicts of Laws.** DSC and Seagen agree the fourth public-interest factor is neutral. (Dkt. No. 24 at 15; Dkt. No. 66 at 13).

**Convenience Does Not Warrant Transfer.** The Court is not persuaded that transfer to the District of Delaware would be clearly more convenient. In fact, after consideration of the relevant factors, the Court is of the opinion that transferring this case would expand and not reduce inconvenience to the parties.

### 3. Transfer to the District of Delaware is Not Proper

For the reasons stated above, the Court concludes that it cannot transfer this case to the District of Delaware. Even if it could transfer this case, DSC has not demonstrated that the Court should. Therefore, the Motion to Transfer should be **DENIED**.

## IV. CONCLUSION

After careful consideration of the facts, arguments, and authorities, the Court concludes that both the Motion to Transfer and the Motion to Dismiss should be, and hereby are, **DENIED**. In light of this opinion, DSC's motions for oral hearing (Dkt. Nos. 80, 113) are **DENIED AS MOOT**.

## So Ordered this

**Jun 28, 2021**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE