# Defendants' Claim Construction Presentation

## *Seagen Inc. v. Daiichi Sankyo Company, Limited*

### Case No. 2:20-cv-00337

### Honorable Chief District Judge Rodney Gilstrap

### August 27, 2021

# Disputed Claim Terms

**Drug Moiety**

**Spacer Unit and Self-Immolative Spacer**

**Drug-Linker Issues**

**Intracellularly Cleaved**

# Disputed Claim Terms

**Drug Moiety**

Spacer Unit and Self-Immolative Spacer

Drug-Linker Issues

Intracellularly Cleaved

# Options Presented in This *Markman* Dispute

## Drug Moiety:  "D is a drug moiety"

| Defendants' Construction | Seagen's Construction |
|---|---|
| "a drug of the dolastatin/auristatin-type having a nitrogen atom that can form a bond with the Spacer unit when y=1 or 2, or with the C-terminal carboxyl group of an Amino Acid unit when y=0"<br><br>*See, e.g.*, '039 patent, 71:18-37. | Plain meaning/no  construction is necessary.<br><br>Alternatively, "D is a drug portion" |

# Seagen's Declarant Agrees the
# Claim Term "Drug Moiety" Is Defined in Section 9.4

- Seagen disregards the Patentee's lexicography and relies instead on extrinsic evidence from Pamela Trail, Ph.D. (a former Seagen employee and current Seagen stockholder)

- But Dr. Trail's deposition testimony confirms the Patentee's lexicography:

  Q.  Where in the '039 patent did you find a definition for the term "drug moiety"?

  **A.  As we discussed, in 9.4.**

  Trail Tr. 119:5-7.

- Seagen seeks to erase this admission via "[c]larification" in an erratum, which still concedes that Section 9.4 defines "drug moiety":

  Q.  Where in the '039 patent did you find a definition for the term "drug moiety"?

  **A.  As we discussed, in 9.4*, column 71, lines 36 through 38*.**

  Trail Tr., Errata Sheet
  (italicized text added by Seagen's erratum).

5

# Patentee Used Lexicography to Define "Drug Moiety"





1.  An antibody-drug conjugate having the formula:

Ab—S—[...N...Ww—Yy— **D**]

. . . wherein . . . D is a drug moiety . . . .

### 9.4 The Drug Unit (Moiety)

The drug moiety (D) of the antibody drug conjugates (ADC) **are** of the dolastatin/auristatin type . . . .

D **is** a Drug unit (moiety) having a nitrogen atom that can form a bond with the Spacer unit when y=1 or 2, with the C-terminal carboxyl group of an Amino Acid unit when y=0 . . . . It is to be understood that the terms "drug unit" and "drug moiety" are synonymous and used interchangeably herein.

*See, e.g.,* '039 patent, 71:18-37 (emphases added), Claim 1.

6

# '039 Patent: Title



**Title:** Monomethylvaline Compounds Capable of Conjugation to Ligands

- "Monomethylvaline compounds" are dolastatin/auristatin-type drugs

*See, e.g.,* '039 patent, (54); Trail Tr. 50:2-15.

7

# '039 Patent: Abstract



## ABSTRACT

Auristatin peptides, including MeVal-Val-Dil-DapNorephedrine (MMAE) and MeVal-Val-Dil-Dap-Phe (MMAF), were prepared and attached to Ligands through various linkers, including maleimidocaproyl-val-cit-PAB. The resulting ligand drug conjugates were active in vitro and in vivo.

- The Abstract refers only to dolastatin/auristatin-type drugs and their use in ligand-drug conjugates

*See, e.g.,* '039 patent, (57); Trail Tr. 51:13-52:17, 53:2-10.

8

# '039 Patent: 40 Sheets of Figures



- Over 40 sheets of figures, every exemplified ADC has a dolastatin/auristatin-type drug moiety

*See, e.g.,* '039 patent, Figs. 1-19, 25-27, 37-39; Trail Tr. 54:2-6.

# '039 Patent: Background of the Invention



Despite in vitro data for compounds of the dolastatin class and its analogs, significant general toxicities at doses required for achieving a therapeutic effect compromise their efficacy in clinical studies. ==Accordingly, there is a clear need in the art for dolastatin/auristatin derivatives having significantly lower toxicity, yet useful therapeutic efficiency.== These and other limitations and problems of the past are addressed by the present invention.

- The patent purports to fill "a clear need in the art for dolastatin/ auristatin derivatives"

*See, e.g.,* '039 patent, 4:22-29; Trail Tr. 69:7-70:18.

10

# '039 Patent: Summary of the Invention

- ## The drug unit (moiety) have formulas based on auristatins MMAE and MMAF:

Formula D$_E$

Formula D$_F$





*See, e.g.*, '039 patent, 6:31-7:42, 11:5-13:63, 15:42-18:17; *see also, e.g. id.* at 44:55-60:26; Trail Tr. 72:10-25.

11

# '039 Patent: Section 9.4



9.4 The Drug Unit (Moiety)

The drug moiety (D) of the antibody drug conjugates (ADC) are of the dolastatin/auristatin type . . . .

D is a Drug unit (moiety) having a nitrogen atom that can form a bond with the Spacer unit when y=1 or 2, with the C-terminal carboxyl group of an Amino Acid unit when y=0 . . . . It is to be understood that the terms "drug unit" and "drug moiety" are synonymous and used interchangeably herein.

# '039 Patent: Section 9.4 Illustrated Drug Moieties

- All illustrated drugs moieties are of the dolastatin/auristatin type:



*See, e.g.*, '039 patent, 74:10-77:16;
Trail Tr. 72:14-25, 82:6-13, 197:4-9.

13

# '039 Patent: Section 9.6.1 Drug Moiety Synthesis

9.6.1 Drug Moiety Synthesis

Typically, peptide-based Drugs can be prepared by forming a peptide bond between two or more amino acids and/or peptide fragments. . . .

The auristatin/dolastatin drug moieties may be prepared according to the general methods of: U.S. Pat. Nos. 5,635,483;  5,780,588;  Pettit et al. (1989) J. Am. Chem. Soc. 111:5463-5465;  Pettit et al. (1998) Anti-Cancer Drug Design 13:243-277;  and Pettit et al. (1996) J. Chem. Soc. Perkin Trans. 1 5:859-863.

*See, e.g.*, '039 patent, 143:17-146:2.

14

# '039 Patent: Illustrated ADCs

- All illustrated ADCs have drug moieties of the dolastatin/auristatin-type:



*See, e.g.*, '039 patent, 49:56-52:30, 61:1-62:39;
Trail Tr. 72:14-25, 82:6-13, 197:4-9.

15

# The '039 Patent's Family Is Directed to Dolastatin/Auristatin-Type Drugs



**Related U.S. Application Data**

Continuation of application No. 15/118,190, filed on Nov. 13, 2017, now ==Pat. No. 10,414,826==, which is a continuation of application No. 15/188,843, filed on Jun. 21, 2016, now abandoned, which is a continuation of application No. 14/194,106, filed on Feb. 28, 2014, now abandoned, which is a continuation of application No. 13/098,391, filed on Apr. 29, 2011, now ==Pat. No. 8,703,714==, which is a continuation of application No. 11/833,954, filed on Aug. 3, 2007, now ==Pat. No. 7,994,135==, which is a division of application No. 10/983,340, filed on Nov. 5, 2004, now ==Pat. No. 7,498,298==.

Provisional application No. 60/622,455, filed on Oct. 27, 2004, provisional application No. 60/598,899, filed on Aug. 4, 2004, provisional application No. 60/557,116, filed on Mar. 26, 2004, provisional application No. 60/518,534, filed on Nov. 6, 2003.

- This patent family's sole focus is on dolastatin/auristatins
  - All claims pursued prior to 2019 limited to dolastatin/auristatins
  - Each application's title refers to "monomethylvaline compounds capable of conjugation"

*See, e.g.,* '039 Patent, (22), (60); U.S. Patent Nos. 7,498,298, Claim 1, 7,994,135, Claim 1, 8,703,714, Claim 36; 10,414,826, Claim 18.

16

# *Baxalta Inc. v. Genentech Inc.* Is Inapposite

- Seagen relies on *Baxalta* to argue that Defendants' reliance on Section 9.4's lexicography is "in isolation from the rest of the patent"

- Unlike *Baxalta*, the '039 patent is entirely consistent with the lexicography in Column 71 for "drug moiety"

  - Title

  - Abstract

  - 40 Sheets of Figures

  - Background: "clear need in the art for dolastatin/auristatin derivatives . . ."

  - Summary of the Invention

  - All embodiments

*See* Seagen Reply Br. at 2.

17

# "A Clear Need in the Art for Dolastatin/Auristatin Derivatives" Does Not Create a Conflict Under *Baxalta*

- Seagen's Reply incorrectly states that "[t]he development of auristatins as drug moieties was just one of the 'problems and limitations of the past' that the '039 patent sought to address"

- The patent actually states is that "there is a clear need in the art for dolastatin/auristatin derivatives" that are improved

  - For example, the patent references problems with toxicity and therapeutic efficiency of prior dolastatin/auristatin derivatives

  - The patent purports to address those, and other limitations and problems of the past, in light of the stated need for improved dolastatin/auristatin derivatives

*See, e.g.*, '039 patent, 4:25-29.

18

# Chemotherapeutic Agents "That Work By Different Mechanisms" Do Not Create a Conflict Under *Baxalta*

- Seagen's citation to alleged "drug moieties that work by different mechanisms" misleadingly revises the specification to include the term "drug moiety" where it does not appear





> ==Other aspects of the invention== include ==drug moieties== that work by different mechanisms,  such as =="a topoisomerase inhibitor"== (the type of drug DSC uses) or a ="DNA binder."= (*Id.* at 19:4-11.)

> ==In another aspect==, the invention  includes a pharmaceutical composition comprising an effective amount of the antibody-drug conjugate compound of the invention,  or a pharmaceutically acceptable salt thereof, and a pharmaceutical  acceptable diluent, carrier or excipient.  ==The composition may further comprise a therapeutically  effective amount of chemotherapeutic agent such as a tubulin-forming  inhibitor, a topoisomerase inhibitor, and a DNA binder.==

*See* Seagen
Reply Br. at 2.

'039 patent,  19:4-11.

19

# "Chemotherapeutic Agent" and "Prodrug" Do Not Create a Conflict Under *Baxalta*

- The specification discloses "chemotherapeutic agents" and "prodrugs" thereof for use *in combination with* alleged compounds of the invention:

  - Col. 19:4-11 ("may further comprise a . . . chemotherapeutic agent")

  - Col. 161:15-16 ("administered concurrently with the chemotherapeutic agent")

  - Col. 161:60-64 ("administering . . . an Exemplary Conjugate and another therapeutic agent that is an anti-cancer agent")

  - Col. 34:50-35:5 (prodrugs are precursors or derivatives of such cytotoxic drugs)

*See* Seagen Reply Br. at 2-3; *see also* '039 patent, 34:50-35:5.

20

# Seagen's Declarant Contradicts Seagen's Proposed Construction

- In deposition, Dr. Trail disagreed that "drug moiety" can be construed to mean "any drug moiety" as Seagen proposes

*See* Seagen Reply Br. at 2; Trail Tr. 178:1-10.



Q.   -- can an antibody be a drug moiety?

A.   In the context of this patent, the answer is no, because this describes specifically antibodies utilized to deliver cytotoxic drugs.

As you know, antibodies can obviously be drugs, there's many that have been approved, but that's not the context of this patent.

# Disputed Claim Terms

Drug Moiety

**Spacer Unit and Self-Immolative Spacer**

Drug-Linker Issues

Intracellularly Cleaved

# Options Presented In This *Markman* Dispute

## The Spacer Unit: "Y is a Spacer unit"

| Defendants' Construction | Seagen's Construction |
|---|---|
| "one or more atoms that links $W_w$ to a nitrogen atom of D, the drug moiety" | Plain meaning/no construction is necessary.<br><br>Alternatively, "Y is a unit that links the amino acid unit to a drug" |

# The Patent's Description of "Spacer Unit"

- The "Spacer unit" links the Drug moiety (or "Drug unit") to the Amino Acid unit ($W_w$).



9.3.3 The Spacer Unit

The Spacer unit (—Y—), when present, links an Amino Acid unit to the Drug moiety when an Amino Acid unit is present. Alternately, the Spacer unit links the Stretcher unit to the Drug moiety when the Amino Acid unit is absent. The Spacer unit also links the Drug moiety to the Ligand unit when both the Amino Acid unit and Stretcher unit are absent.

'039 patent, 68:13-19.

24

# The Patent's Description of "Spacer Unit"

- The "Drug unit," in turn, has a nitrogen atom that forms a bond with the "Spacer unit."



D is a Drug unit (moiety) having a nitrogen atom that can form a bond with the Spacer unit when y=1 or 2, with the C-terminal carboxyl group of an Amino Acid unit when y=0, with the carboxyl group of a Stretcher unit when w and y=0, and with the carboxyl group of a Drug unit when a, w, and y=0. It is to be understood that the terms "drug unit" and "drug moiety" are synonymous and used interchangeably herein.

'039 patent, 71:30-37.

25

# Exemplary Embodiments

Each and every exemplary drug moiety in the patent contains a nitrogen atom that links to the Spacer unit.



'039 patent, 6:50-67.

'039 patent, 53:16-58:18.

'039 patent, 74:12-78:16.

'039 patent, 61:1-62:40.

26

# Seagen Accuses Defendants of Excluding Embodiments

**Defendants' Proposed Construction:**
"one or more atoms that links $W_w$ to a nitrogen atom of D, the drug moiety"

As discussed above and in Seagen's opening brief, DSC's construction would exclude from the scope of the claim disclosed embodiments in which the spacer unit is connected to the drug via groups that do not contain a nitrogen atom. (Seagen Br. at 6.)

Seagen Reply Br. at 6.

# Defendants' Description Is Consistent with Exemplary Embodiments

**Defendants' Proposed Construction:**
"one or more atoms that links $W_w$ to a nitrogen atom of D, the drug moiety"

**Figure 21**

**Figure 22**





D, the Drug moiety, in Figures 21 and 22 would link to the Spacer unit via a nitrogen atom located on D.

28

# *Williamson v. Citrix Online, LLC,* 792 F.3d 1339 (Fed. Cir. 2015) (en banc)

- "[F]ailure to use the word 'means' . . . creates a rebuttable presumption."  But the presumption is not strong. *See id.* at 1348.

- The presumption against means-plus-function is overcome when "the claim term fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'"  *Id.*

- "Nonce" words can operate as a substitute for "means" and trigger application of § 112 ¶ 6.  *Id.* at 1350.  Modifiers before a "nonce" word must describe a sufficiently definite structure to avoid application of § 112 ¶ 6.  *Id.* at 1351.

29

# *Diebold Nixdorf, Inc. v. ITC,*
# 899 F.3d 1291 (Fed. Cir. 2018)

- "Cheque standby unit" is subject to § 112 ¶ 6.

- "The standard by which we determine whether § 112, para. 6 applies 'is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.'" *Id.* at 1297.

30

# *Diebold Nixdorf, Inc. v. ITC,*
## 899 F.3d 1291 (Fed. Cir. 2018)

- "[T]he claims describe the term 'cheque standby unit' **solely in relation to its function and location in the apparatus**."

- "**[T]he word 'unit,' . . . does not, standing alone, connote any particular structure**. Nor is sufficient structure imparted by modifying the word 'unit' with the words 'cheque' and 'standby' or by specifying the location of the 'cheque standby unit.'" *Id.* at 1301.

- "Nor does the fact the 'cheque standby unit' must be formed on the main transfer unit between the first and second gates offer any guidance 'that might inform the structural character of the limitation-in-question or otherwise impart structure' to the term as recited in the claims." *Id.* at 1298–99.

31

# *Diebold Nixdorf, Inc. v. ITC,*
# 899 F.3d 1291 (Fed. Cir. 2018)

- "[T]he Commission credited Dr. Howard's expert testimony in determining that the term 'cheque standby unit' connotes sufficiently definite meaning as the name for structure to persons of ordinary skill in the art."  *Id.* at 1299.

- "The Commission and Hyosung raise two arguments in response. First, they contend that, because Diebold failed to present affirmative evidence of how a person of ordinary skill would understand the claim language, Diebold failed to rebut the presumption against the application of § 112, para. 6. Second, they submit both that the Commission was entitled to credit Dr. Howard's testimony, and that such testimony was sufficient to demonstrate that the term 'cheque standby unit' had a structural meaning to persons of skill in the art at the relevant time."  *Id.*

# *Diebold Nixdorf, Inc. v. ITC,*
# 899 F.3d 1291 (Fed. Cir. 2018)



- "First, none of our cases mandate that a party seeking to overcome the presumption against application of § 112, para. 6 can only do so by presenting extrinsic evidence that one of ordinary skill would fail to understand that a term connotes a definite structure."  *Id.* at 1299.

33

# *Diebold Nixdorf, Inc. v. ITC,*
# 899 F.3d 1291 (Fed. Cir. 2018)



- Patentee's expert testified that a person of ordinary skill in the art "would understand the unit must be 'comprised of well-known components for holding cheques in a standby configuration pending user confirmation of the deposit,' and must 'interface with the main transfer path.'"  *Id.* at 1300.

- "Nowhere in [Dr. Howard's] testimony does he explain with any degree of definiteness what structure or class of structures a person of ordinary skill would understand the term to encompass."  *Id.*

- "He likewise **failed to offer any structural limitation that might serve to cabin the scope of the functional term**."  *Id.* at 1300–01.

- "In essence, Dr. Howard did little more than opine that a skilled artisan would understand the functional term 'cheque standby unit' to be any structure capable of performing the claimed function."  *Id.* at 1301.

34

# Seagen's Cited Cases Are Inapposite



***Panoptis Patent Mgmt., LLC v. Blackberry Ltd.,*** **No. 2:16-CV-62-JRG-RSP, 2017 WL 497571 (E.D. Tex. Feb. 7, 2017)**

- "Determination unit" was not a means-plus-function limitation because it connoted a structure.

- "In the context of a mobile-communication-system patent and a claim to a 'mobile station apparatus,' the 'determination unit' is a specially configured electronic circuit." *Id.* at *5.

- "[T]ogether, the claims require the 'determination unit' to be connected to the 'reception unit' in such a way as to have access to the allocation information the 'determination unit' uses to determine the resource of downlink. The claim also **provides structure through the details of indices of the allocation information**—'the indices of a plurality of the consecutive resource blocks are respectively associated with a plurality of the resources which are different in a frequency domain.'" *Id.*

35

# Seagen's Cited Papers Do Not Impose Structural Limits on "Spacer"



In either case, synthesis of a tripartate prodrug in which the specifier and drug are linked together by a special type of <mark>a connector group</mark>, A-link-B (Scheme I), <mark>may overcome these difficulties by spacing the drug B away from the specifier moiety A</mark>, so that the enzymatic activation now involves hydrolysis of the A-link bond rather than the A-B bond.

Carl 1981 (SGIEDTEX00042264; Ex. 3 to Seagen Opening Br.).

<mark>The incorporation of a self-immolative spacer between the dipeptide and the drug ensures access to the site of cleavage by lysosomal enzymes</mark> such as cathepsin B (16).

Ajaj 2009 (SGIEDTEX00042203; Ex. 4 to Seagen Opening Br.).

36

# Seagen's Cited Papers Do Not Impose Structural Limits on "Spacer"



Herein we report the synthesis of branched drug-dipeptide linker compounds that can be conjugated to free thiol groups generated on MAbs by treatment with limiting amounts of dithiothreitol (DTT). The dipeptides are cleaved by lysosomal proteases following internalization of the resulting immunoconjugates. The liberation of active drug by these dipetide conjugates requires the presence of a self-immolative *p*-aminobenzyloxycarbonyl (PABC) spacer, presumably because of steric constraints in the enzyme active site.

Dubowchik 2002 (SGIEDTEX00042254; Ex. 6 to Seagen Opening Br.).

37

# *Robert Bosch, LLC v. Snap-On Inc.*,
# 769 F.3d 1094 (Fed. Cir. 2014)

- "[M]erely listing examples of possible structures is insufficient to avoid invocation of § 112, ¶ 6. Indeed, means-plus-function language that defines a category in functional terms will typically cover examples of structures that fall within it. This is not a basis for distinguishing structural language from § 112, ¶ 6 language." *Id.* at 1101; *see also MTD Prods. Inc. v. Iancu,* 933 F.3d 1336, 1343 (Fed. Cir. 2019).

38

# Seagen's Construction Imposes No Structural Limits

Q. Are you taking the position that a spacer unit could be anything, any number of atoms?

\* \* \*

A. So in many ways this comes back to producing an ADC by conjugation versus producing an ADC that has function and will release drug. So as you know, the purpose of the spacers are for stability of the ADC, and they're also to enable enzymatic cleavage of the linkers. So any spacer of any size that can fulfill those definition would have the potential to be biologically active. Anything could be thrown in as a spacer. It just would not necessarily produce a function of ADC.

Trail Tr. 271:14-272:5.

| Seagen's Construction |
|---|
| Plain meaning/no construction is necessary. |
| Alternatively, "Y is a unit that links the amino acid unit to a drug" |

39

# Seagen Has Rejected Every Attempt to Impose Structure on the Claim Term

[3] DSC also proposes that the term be construed to include the limitation "one or more atoms" in place of the commonly understood term "unit." The specification of the patent does not define the term "unit" as being "one or more atoms," so there is no reason to deviate from the plain and ordinary meaning. Nor is there any dispute that DSC's construction of "unit" would resolve. Hence, the inclusion of this unnecessary verbiage should be rejected.

Seagen Opening Br. at 7 n.3.

DSC's proposal introduces a specialized meaning to the term "unit" which is inappropriate given the intrinsic and extrinsic evidence. Although molecules do contain atoms, the patent doesn't refer to a "unit" as being "one or more atoms." The atomic structure of a spacer is not at issue in this case and DSC's proposal introduces ambiguity.

Trail Declaration ¶ 21.

| Seagen's Construction |
| --- |
| Plain meaning/no construction is necessary.<br><br>Alternatively, "Y is a unit that links the amino acid unit to a drug" |

40

# Construing a Means-Plus-Function Claim Term

**Step One:**

Identify the claimed function

- Dr. Trail states that the spacer unit's functions include enhancing stability and supporting enzymatic cleavage to release free drug

> Q. And I'm trying to figure out what spacers are within the scope of the '039 patent claims. Sitting here today, do you believe there is any limitation whatsoever as to the type of spacers that are within scope of the '039 patent claims?
>
> \* \* \*
>
> A. Once again, I looked at what was exemplified here. I did not do an analysis of everything that could function as a spacer. What's claimed here, as I read it, in the patent, is a spacer unit which is zero, one or two. So if it meets that definition, and it is able to improve stability and/or more efficiently enable enzymatic cleavage, I believe it is covered here. But I have not done that analysis to tell you what those structures are.

Trail Tr. 272:6-24.

41

# Construing a Means-Plus-Function Claim Term

## Step Two:

Determine what structure, if any, disclosed in the specification corresponds to the claimed function
- Dr. Trail conceded she had not "done the analysis to tell you what those structures are."

Q.  And I'm trying to figure out what spacers are within the scope of the '039 patent claims. Sitting here today, do you believe there is any limitation whatsoever as to the type of spacers that are within scope of the '039 patent claims?

\* \* \*

A.  Once again, I looked at what was exemplified here. I did not do an analysis of everything that could function as a spacer. What's claimed here, as I read it, in the patent, is a spacer unit which is zero, one or two. So if it meets that definition, and it is able to improve stability and/or more efficiently enable enzymatic cleavage, I believe it is covered here. But I have not done that analysis to tell you what those structures are.

Trail Tr. 272:6-24.

Q.  Understood. Now, does the patent provide any guidance as to how to determine spacers that meet those functional requirements that you just described?

\* \* \*

A.  No.

Trail Tr. 273:13-18.

42

# The Cases Seagen Cites Are Inapposite

But there is nothing improper about functional claim language. *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 39 (Fed. Cir. 2020); *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1232 (Fed. Cir. 2016). Nor does the mere presence of functional language convert a claim term into a means-plus-function term absent the use of the word "means." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018) ("[T]he mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions."); *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1353 (Fed. Cir. 2020) (rebuttal presumption that section 112, paragraph 6 applies in the absence of "means for"). In fact, DSC's own proposed construction is functional: "one or more atoms *that links* W$_w$ to a nitrogen atom of D." (DSC Br. at 14 (emphasis added).)

Seagen Reply Br. at 5-6.

# Seagen's Cited Cases Are Inapposite



### *Nevro Corp. v. Bos. Sci. Corp.,* 955 F.3d 35 (Fed. Cir. 2020)

- Seagen cites this case for the proposition that functional claim language is not per se improper. Defendants agree

- However, the portion of *Nevro* Seagen cites (955 F.3d at 39) does not discuss a means-plus-function limitation, just functional language that imposes a function on a method claim

44

# Seagen's Cited Cases Are Inapposite

***Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP***, **838 F.3d 1224 (Fed. Cir. 2016)**

- "We note, however, that in the context of 35 U.S.C. § 112, ¶ 6, we require that, if a patentee writes his claims in 'means-plus-function' form, **he must 'disclose the particular structure that is used to perform the recited function**.' *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009). This is intended to avoid 'pure functional claiming,' where a patentee 'claim[s] all possible means of achieving a function.' *Id.* However, **by agreeing that 'processing system' is not a means-plus-function term, Cox has already conceded that 'processing system' itself recites sufficiently definite structure and there is no problem of 'pure functional claiming' here**."

45

# Seagen's Cited Cases Are Inapposite

**Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.**, 948 F.3d 1342 (Fed. Cir. 2020)

- "[T]the term 'digital processing unit' clearly serves as a stand-in for a 'general purpose computer' or a 'central processing unit,' each of which would be understood as a reference to structure in this case, not simply any device that can perform a particular function."  *Id.* at 1354.

- The Board also contradicted itself.  *Id.* ("The Board's treatment of the 'digital processing unit' limitation in claim 11 as structural in nature undermines its conclusion that the same term in claim 1 was functional and thus subject to analysis under section 112, paragraph 6.").

46

# Meet & Confer Process

Seagen refused to clarify whether it believed its claim construction position imposed any structural limitation on the claim

Exhibit 3 to Defendants' Claim Construction Response Brief (DSC's Email of May 24, 2021 at 8:25 am)

Counsel:

We write concerning Seagen's disclosure pursuant to P.R. 4-2.  There appear to be several places where we may be able to converge on agreement, or at least crystallize our disputes.

<u>Y is a Spacer Unit</u>
We understand you to contend that a "Spacer unit" is a "unit that links the amino acid unit to a drug."  We assume you agree that the 'amino acid unit' is $W_w$, as identified in our proposed construction.  Please confirm.  Do you likewise agree that the Spacer unit must connect to a nitrogen atom of a drug?
Your proposed construction does not clarify what you mean by a "unit."  Does this term impose any structural limitation on the claim?  If so, how does it do so?

47

# Meet & Confer Process

Seagen refused to clarify whether it believed its claim construction
position imposed any structural limitation on the claim

Exhibit 3 to Defendants' Claim Construction Response Brief
(Seagen's Response of May 24, 2021 at 8:23 pm)

Counsel,

As to your position regarding "Y is a spacer unit," are you asking if we can agree to a construction as follows: "Y is a unit that links the amino acid unit, $W_w$, to a drug"?  If not, it appears we are far apart.

We have reviewed the remainder of your positions and it doesn't appear that we are in agreement on those.

Best,
Teresa

48

# Meet & Confer Process

Exhibit 3 to Defendants' Claim Construction Response Brief (DSC's Email of May 26, 2021 at 8:38 pm)

Counsel:

The point of our prior email was to confer pursuant to P.R. 4-2 in hopes of finding common ground or clarifying points of disagreement.  Your response did not address the vast majority of our questions.  Where possible, we have inferred that you disagree with us and have restated our understanding of the parties' dispute.  If you believe any aspect of this does not accurately capture our disputes, please let us know promptly.

**Y is a Spacer Unit**
We are not proposing that "Y is a Spacer unit" be construed as "Y is a unit that links the amino acid unit, $W_w$, to a drug."  From your response, we understand there to be two disputes:  (1) what is a "unit"?; and (2) whether the "Spacer unit" must connect to a nitrogen atom.  We had thought we would be able to resolve (1), as we imagined it non-controversial that the Spacer unit is "one or more atoms."  But if you disagree with that, we would appreciate knowing what you contend a "unit" is, if not that, so we may assess your position in the hopes of reaching agreement.

49

# Meet & Confer Process

Exhibit 3 to Defendants' Claim Construction Response Brief (Seagen's Response of June 1, 2021 at 1:56 pm)

Counsel,

We disagree with your characterizations of our positions below.  We also don't see your positions as attempts to reach compromise, but rather to balloon the number of issues in dispute beyond the customary number for EDTX.  In addition, we find your positions confusing, and unsupported by the intrinsic evidence.  Please explain why they are correct.

If you'd like a further meet and confer, we are available Thursday between 10-12 or 1-3 pm PT.

Best,
Teresa

# Meet & Confer Process

Exhibit 3 to Defendants' Claim Construction Response Brief (DSC's Response of June 2, 2021 at 3:54 pm)

Counsel,

We note your refusal to confer with us on the substance of the parties' positions, as reflected in the below email exchange. Your suggestion that we instead confer by phone the day before the parties' joint filing is due seems unlikely to provide us with sufficient time to confer with our client in Japan, but we can be available during the 1-2 pm PT window to discuss any proposed changes to the attached draft as we prepare to file on Friday. In advance of the call, please explain what about our positions you find confusing and what about our understanding of Seagen's positions you disagree with.

Best,
Mike

# Options Presented In This *Markman* Dispute

**The Spacer Unit:  "wherein Y is a self-immolative spacer"**

| Defendants' Construction | Seagen's Construction |
|---|---|
| "wherein the drug moiety is released from Y without a separate hydrolysis step" | Plain meaning/no construction is necessary.<br><br>Alternatively, "wherein Y is a spacer that degrades to release the drug after cleavage of the amino acid unit." |

52

# The Specification Distinguishes Between Two Types of Spacer Units

## Non Self-Immolative Spacer



Spacer units are of two general types: self-immolative and non self-immolative. A non self-immolative Spacer unit is one in which part or all of the Spacer unit remains bound to the Drug moiety after cleavage, particularly enzymatic, of an Amino Acid unit from the Drug-Linker-Ligand Conjugate or the Drug-Linker Compound. Examples of a non self-immolative Spacer unit include, but are not limited to a (glycine-glycine) Spacer unit and a glycine Spacer unit (both depicted in FIG. 20) (infra). When an Exemplary Compound containing a glycine-glycine Spacer unit or a glycine Spacer unit undergoes enzymatic cleavage via a tumor-cell associated-protease, a cancer-cell-associated protease or a lymphocyte-associated protease, a glycine-glycine-Drug moiety or a glycine-Drug moiety is cleaved from $L-A_a-W_w-$. In one embodiment, an independent hydrolysis reaction takes place within the target cell, cleaving the glycine—Drug moiety bond and liberating the Drug.

'039 patent, 68:20-35.

53

# The Specification Distinguishes Between Two Types of Spacer Units

**Self-Immolative Spacer**



Alternatively, an Exemplary Compound containing a self-immolative Spacer unit can release -D without the need for a separate hydrolysis step. In this embodiment, —Y— is a PAB group that is linked to —$W_w$— via the amino nitrogen atom of the PAB group, and connected directly to -D via a carbonate, carbamate or ether group. Without being bound by any particular theory or mechanism, FIG. 21 depicts a possible mechanism of Drug release of a PAB group which is attached directly to -D via a carbamate or carbonate group espoused by Toki et al. (2002) J Org. Chem. 67:1866-1872.

'039 patent,  68:48-57.

54

# The Specification Distinguishes Between Two Types of Spacer Units

Q. Now, do you agree that there are two kinds of spacer units that are referred to in this patent; self-immolative and non self-immolative?

A. Yes.

Q. And did you agree that a space unit can't be both self-immolative and non-self-immolative?

* * *

Q. It has to be one or the other, right?

A. Yes.

Trail Tr. at 273:19-274:5.

55

# Exemplary Non Self-Immolative Spacers

| Defendants' Construction | Seagen's Construction |
|---|---|
| "wherein the drug moiety is released from Y without a separate hydrolysis step" | Plain meaning/no  construction is necessary.<br>Alternatively, "wherein Y is a spacer that degrades to release the drug after cleavage of the amino acid unit." |

**FIG. 20** shows examples of compounds  with a **non self-immolative**  Spacer unit.

'039 patent,  21:3-4.

Once inside the cell, one or more specific peptide sequences within the Linker unit are hydrolytically cleaved by one or more tumor-cell or cancer-cell-associated proteases, resulting in release of a Drug or a Drug-Linker Compound.

039 patent, 159:9-13.



'039 patent,  68:25-28; Figure 20.

56

# Exemplary Self-Immolative Spacers

| Defendants' Construction | Seagen's Construction |
|---|---|
| "wherein the drug moiety is released from Y without a separate hydrolysis step" | Plain meaning/no construction is necessary. Alternatively, "wherein Y is a spacer that degrades to release the drug after cleavage of the amino acid unit." |



'039 patent, 68:49-67; Figures 21-22.

57

# Seagen's Principal Argument

[T]he specification . . . provides several examples of self-immolative spacers that, contrary to DSC's construction, undergo a hydrolysis step to release the drug, demonstrating that DSC's proposed construction would impermissibly exclude such embodiments. (*Id.* (citing '039 pat. at 69:1-16).)

Other examples of self-immolative spacers include, but are not limited to, aromatic compounds that are electronically similar to the PAB group such as 2-aminoimidazol-5-methanol derivatives (Hay et al. (1999) Bioorg. Med. Chem. Lett. 9:2237) and ortho or para-aminobenzylacetals. Spacers can be used that undergo cyclization upon amide bond hydrolysis, such as substituted and unsubstituted 4-aminobutyric acid amides (Rodrigues et al., Chemistry Biology, 1995, 2, 223), appropriately substituted bicyclo[2.2.1] and bicyclo[2.2.2] ring systems (Storm, et al., J. Amer. Chem. Soc., 1972, 94, 5815) and 2-aminophenylpropionic acid amides (Amsberry, et al., J. Org. Chem., 1990, 55, 5867). Elimination of amine-containing drugs that are substituted at the a-position of glycine (Kingsbury, et al., J. Med. Chem., 1984, 27, 1447) are also examples of self-immolative spacer useful in Exemplary Compounds.

Seagen Reply Br. at 6-7.

'039 patent, 69:1-16.

58

# Response to Seagen's Argument

Showing enzymatic hydrolysis of compound **5** followed by cyclization to degrade the linker of compound **3** to yield free drug **1.**

Other examples of self-immolative spacers include, but are not limited to, aromatic compounds that are electronically similar to the PAB group such as 2-aminoimidazol-5-methanol derivatives (Hay et al. (1999) Bioorg. Med. Chem. Lett. 9:2237) and ortho or para-aminobenzylacetals.  Spacers can be used that undergo cyclization upon amide bond hydrolysis, such as substituted and unsubstituted 4-aminobutyric acid amides (Rodrigues et al., Chemistry Biology, 1995, 2, 223), appropriately substituted bicyclo[2.2.1] and bicyclo[2.2.2] ring systems (Storm, et al., J. Amer. Chem. Soc., 1972, 94, 5815) and 2-aminophenylpropionic acid amides (Amsberry, et al., J. Org. Chem., 1990, 55, 5867). Elimination of amine-containing drugs that are substituted at the a-position of glycine (Kingsbury, et al., J. Med. Chem., 1984, 27, 1447) are also examples of self-immolative spacer useful in Exemplary Compounds.



'039 patent, 69:1-16.

Rodrigues 1995 at 224.

59

# Disputed Claim Terms

Drug Moiety

Spacer Unit and Self-Immolative Spacer

## Drug-Linker Issues

Intracellularly Cleaved

# Options Presented In This *Markman* Dispute

## Drug-Linker Claim Limitations:
## "p ranges from 1 to about 20"

| Defendants' Construction | Seagen's Construction |
|---|---|
| "p" must be an integer. | Plain meaning/no construction is necessary. A person of ordinary skill in the art would understand with reasonable certainty the scope of what is claimed.<br><br>Alternatively, "The drug to antibody ratio ranges from 1 to about 20." The drug to antibody ratio, p, does not need to be an integer. |

# Claim Language

## Claim 1 refers to "an" antibody-drug conjugate





1. **An antibody-drug conjugate** having the formula:

'039 patent, at Claim 1.

# Dr. Trail's Testimony
## Confirms Defendants' Construction

33. I understand that DSC believes that "'p' must be an integer." As I explained above, DSC's proposed construction departs from the plain and ordinary meaning of the term. The specification describes non-integer p values. '039 patent at Figs. 7-10, 19:63-20:19, 153:19-154:12. And while an individual ADC molecule (i.e., a single antibody with one or more conjugated drug units) would have a p value that is an integer….

Trail Declaration ¶ 33.

Q.  So in context of Claim 1, do you agree or disagree that P is an integer?

\* \* \*

A.  So it is drawn on an individual antibody basis, P would be an integer.

Trail Tr.  256:10-14.

63

# Options Presented In This *Markman* Dispute

## Drug-Linker Claim Limitations:
## "wherein the S is a sulfur atom on a cysteine residue of the antibody"

| Defendants' Construction | Seagen's Construction |
|---|---|
| Indefinite (the claim does not provide reasonable certainty at least regarding how the POSA would understand the scope of "a sulfur atom on a cysteine residue of the antibody" given that "p ranges from 1 to about 20")<br><br>Alternatively, each of the p  are attached to a single sulfur atom. | Plain meaning/no construction is necessary. A person of ordinary skill in the art would understand with reasonable certainty the scope of what is claimed.<br><br>Alternatively, "wherein S is a sulfur atom on a cysteine amino acid in the antibody." |

64

# *Chef America, Inc. v. Lamb-Weston, Inc.,*
## 358 F.3d 1371 (Fed. Cir. 2004)

- "As noted, the claim requires 'heating the resulting batter-coated dough to a temperature in the range of about 400° F. to 850° F.' These are ordinary, simple English words whose meaning is clear and unquestionable. There is no indication that their use in this particular conjunction changes their meaning. They mean exactly what they say. The dough is to be heated to the specified temperature."   *Id.* at 1373.

# *Chef America, Inc. v. Lamb-Weston, Inc.,*
## 358 F.3d 1371 (Fed. Cir. 2004)



- "The problem is that if the batter-coated dough is heated to a temperature range of 400° F. to 850° F., as the claim instructs, it would be burned to a crisp. Instead of the 'dough products suitable for freezing and finish cooking to a light, flaky, crispy texture,' . . . which the patented process is intended to provide, the resultant product of such heating will be something that, in the words of one of the attorneys in this case, resembles a charcoal briquet." *Id.* at 1373.

66

# *Chef America, Inc. v. Lamb-Weston, Inc.,*
# 358 F.3d 1371 (Fed. Cir. 2004)

- "This court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity. *See, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1349 (Fed.Cir.2002); … *Process Control Corp. v. Hydreclaim Corp.,* 190 F.3d 1350, 1357 (Fed.Cir.1999)." *Id.* at 1374.

- "Even 'a nonsensical result does not require the court to redraft the claims of the ['290] patent. Rather, where as here, claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated.'" *Id.*

- "Thus, in accord with our settled practice we construe the claim as written, not as the patentees wish they had written it. As written, the claim unambiguously requires that the dough be heated to a temperature range of 400° F. to 850° F." *Id.*

67

# Parentheses Placement Matters



**Table 2.2**     **Nomenclature of Some Short Branched-Chain Alkyl Groups**

| Group structure | Condensed structure | Written name | Pronounced name |
|---|---|---|---|
| $CH_3$—$CH$—$CH_3$ | $(CH_3)_2CH$— | isopropyl | isopropyl |
| $CH_3$—$CHCH_2$—$CH_3$ | $(CH_3)_2CHCH_2$— | isobutyl | isobutyl |
| $CH_3CH_2CH$—$CH_3$ | — | sec-butyl | secondary butyl |
| $CH_3$—$C$—$CH_3$ with $CH_3$ | $(CH_3)_3C$— | tert-butyl (or t-butyl) | tertiary butyl |
| $CH_3$—$C$—$CH_2$— with $CH_3$, $CH_3$ | $(CH_3)_3CCH_2$— | neopentyl | neopentyl |

Organic Chemistry, Third Edition, G. Marc. Loudon, 1988, p. 58.

68

# *Scripps Research Institute v. Illumina, Inc.*, 782 F. App'x 1018 (Fed. Cir. 2019)

- "[T]he formula $CH_3(CH_2)_8CH_3$ represents the straight-chain hydrocarbon decane. The subscript outside the parentheses indicates how many times the group inside the parentheses repeats, *i.e.*, that there are eight saturated carbons singly bonded to one another in between two methyl groups." *Id.* at 1023.

- This is "ordinary chemical nomenclature." *Id.*

# Applying Chemical Nomenclature to Patent's Structures

*Scripps* example: $CH_3(CH_2)_8CH_3$



'039 patent, Claim 1

'039 patent, 70:23-27

# Applying Chemical Nomenclature to Patent's Structures Where p = 3



'039 patent Claim 1.

'039 patent 70:23-27.

71

# The Claim v. The Specification



('039 patent, Claim 1)                    ('039 patent, 70:23-27)

Dr. Trail conceded these are not the same structures

Q.   Does that mean you think the drawings are the same?
A.   I think what they accomplish is intended to be the same.
Q.   But that's not my question. My question is: Do you agree that the two drawings are not the same?

* * *

A.   The drawings depicted here are not the same.

Trail Tr. 264:1-10.

# *Chef America, Inc. v. Lamb-Weston, Inc.,*
# 358 F.3d 1371 (Fed. Cir. 2004)

- The patentees "argue only that 'to' should be construed to mean 'at' because **otherwise the patented process could not perform the function the patentees intended**. As we have noted, however, **we have repeatedly declined to rewrite unambiguous patent claim language for that reason**."

Q. Okay. And would you agree that from the standpoint of, of conveying mild clues in terms of structure, that it requires precision?

\* \* \*

A. So I have seen this drawing in this both fashions in this patent. I've seen it drawn in both fashions in Daiichi publications. In looking at the structures, it's clear to me that the intention is to look at the linkers attached to a cysteine, so the sulfur in a cystine with a numeric being one linker per sulfur.

Trail Tr. 264:1-10, 265:8-20.

73

# Nakada et al. 2016

For example, the article by Nakada et al.—a publication by DSC scientists—provides a similar diagram to that found in Claim 1's formula, where a sulfur atom (S) appears outside the parentheses that illustrate the drug-linker unit.  (Ex. 18 at SGIEDTX00008241.)  Thus, DSC's own scientists have found that this is a clear and definite way to notate an ADC that has the structure of Claim 1. [No citation.]

*Seagen Reply Br. at 9.*



Ex. 18 to Seagen Opening Br.



Ex. 18 to Seagen Opening Br.

74

# Other Seagen Patents in Same Family

**US Patent No. 8,703,714**



**35**. The antibody-drug conjugate of claim **1**, having the formula:

Ab-MC-vc-PAB-MMAF

**US Patent No. 7,994,135**



**23**. An antibody-drug conjugate compound of claim **1** having the formula:

Ab-MC-vc-PAB-MMAF

75

# Indefiniteness

- *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366–67 (Fed. Cir. 2021) ("Here, the asserted claims of the '446 patent are nonsensical and require an impossibility . . . .  We therefore hold that the claims are indefinite as a matter of law under § 112, paragraph 2.")

- *Invensys Sys., Inc. v. Emerson Elec. Co.*, No. 12-799, 2014 WL 3976371, at *5 (E.D. Tex. Aug. 6, 2014) ("Because the plain language of all three independent claims of the '131 Patent require performing a calculation that is mathematically impossible, the claims are indefinite and render the '131 Patent invalid.")

In contrast, DSC would have the Court insert limitations into the term so that every drug-linker unit, "p," must bond with a "*single* sulfur atom." This construction would mean that, in Claim 5, all "about 8" drug-linker units would have to be bonded to the same sulfur atom. As sulfur can only support six bonds maximum (as opposed to "about 8"), the construction would result in a scientific impossibility that DSC asserts renders the claim indefinite. Yet DSC presents no evidence that this is how one of ordinary skill would interpret the claims, and the inoperability of its own construction confirms skilled artisans, in fact, would not interpret them as DSC proposes. (*See* Trail Decl. ¶ 40.) The Court should reject DSC's attempt to create indefiniteness where there is none. If helpful for lay jurors, however, the scientific term "residue" could be construed as "amino acid."

Seagen Opening Br. at 15.

# Disputed Claim Terms

Drug Moiety

Spacer Unit and Self-Immolative Spacer

Drug-Linker Issues

**Intracellularly Cleaved**

# Options Presented in This *Markman* Dispute

**Intracellular Cleavage:  "wherein the drug moiety is ==intracellularly cleaved== in a patient from the antibody of the antibody-drug conjugate or an intracellular metabolite of the antibody-drug conjugate"**

| Defendants' Construction | Seagen's Construction |
|---|---|
| "wherein the free drug moiety dissociates from the antibody as a result of a metabolic process or reaction inside a cell in a patient that breaks the covalent attachment, of an antibody-drug conjugate or an intracellular metabolite of an antibody-drug conjugate, between the drug moiety (D) and the antibody (Ab)"<br><br>*See, e.g.,* '039 patent, 29:48-57. | Plain meaning/no construction is necessary.<br><br>Alternatively, "wherein the drug is separated within a cell from the antibody of the antibody-drug conjugate or a metabolite of the antibody-drug conjugate." |

78

# Disputed Claim Term

- The claims expressly require that "**_the drug moiety_** is intracellularly cleaved"



1.  An antibody-drug conjugate having the formula:

. . . wherein . . . D is a drug moiety . . .

. . . wherein the drug moiety is intracellularly cleaved in a patient from the antibody of the antibody-drug conjugate or an intracellular metabolite of the antibody-drug conjugate.

*See, e.g.,* '039 patent, Claim 1.

79

# Patentee Used Lexicography
## to Define "Intracellularly Cleaved"



The terms "intracellularly cleaved" and "intracellular cleavage" refer to a metabolic process or reaction inside a cell on an [sic] Drug-Ligand Conjugate, a Drug-Linker-Ligand Conjugate, an antibody drug conjugate (ADC) or the like whereby the covalent attachment, e.g., the linker, between the drug moiety (D) and the antibody (Ab) is broken, resulting in the free drug dissociated from the antibody inside the cell.

- The Patentee's definition has four requirements:
  1. a specific process ("a metabolic process or reaction");
  2. the location in which the process occurs ("inside a cell");
  3. what must be "broken" ("the covalent attachment . . . between the drug moiety (D) and the antibody (Ab)"); and
  4. the result ("the *free* drug dissociated from the antibody inside the cell")

*See, e.g.,* '039 patent, 29:48-57.

# Defendants' Construction Applies Patentee's Lexicography to the Claim Limitation

| Claim Limitation | Defendants' Construction |
|---|---|
| ". . . wherein the drug moiety is **intracellularly cleaved** in a patient from the antibody of the antibody-drug conjugate or an intracellular metabolite of the antibody-drug conjugate" | wherein the free drug moiety dissociates from the antibody as a result of a metabolic process or reaction inside a cell in a patient that breaks the covalent attachment, of an antibody-drug conjugate or an intracellular metabolite of an antibody-drug conjugate, between the drug moiety (D) and the antibody (Ab) |

**Lexicography from 29:48-57:**

The terms "intracellularly cleaved" and "intracellular cleavage" refer to a metabolic process or reaction inside a cell on an Drug-Ligand Conjugate, a Drug-Linker-Ligand Conjugate, an antibody drug conjugate (ADC) or the like whereby the covalent attachment, e.g., the linker, between the drug moiety (D) and the antibody (Ab) is broken, resulting in the free drug dissociated from the antibody inside the cell.

*See, e.g.,* '039 patent, 29:48-57, Claim 1.

81

# Defendants' Construction Applies Patentee's Lexicography to the Claim Limitation

| Claim Limitation | Defendants' Construction |
|---|---|
| ". . . wherein the drug moiety is **intracellularly cleaved** in a patient from the antibody of the antibody-drug conjugate or an intracellular metabolite of the antibody-drug conjugate" | wherein the free drug moiety dissociates from the antibody as a result of a metabolic process or reaction inside a cell in a patient that breaks the covalent attachment, of an antibody-drug conjugate or an intracellular metabolite of an antibody-drug conjugate, between the drug moiety (D) and the antibody (Ab) |

**Lexicography from 29:48-57:**

The terms "intracellularly cleaved" and "intracellular cleavage" refer to a metabolic process or reaction inside a cell on an [sic] Drug-Ligand Conjugate, a Drug-Linker-Ligand Conjugate, an antibody drug conjugate (ADC) or the like whereby the covalent attachment, e.g., the linker, between the drug moiety (D) and the antibody (Ab) is broken, resulting in the free drug dissociated from the antibody inside the cell.

*See, e.g.,* '039 patent, 29:48-57, Claim 1.

82

# Seagen Attempts to Avoid the Definition's "Free Drug" Requirement

- Under the guise of "avoid[ing] jury confusion," Seagen omits the specification's explicit requirement that intracellular cleavage "result[s] in the *free* drug dissociat[ing] from the antibody"

  *See* Seagen Reply Br. at 10.

- **Seagen**, however, states that it would not oppose referencing the "free drug" requirement, **but only if "free drug" is regarded as referring to "the active drug component of an ADC."**

  *See id.*

- But the claim **requires** that the "drug moiety" be intracellularly cleaved

  *See* '039 patent, Claim 1.

83

# "Covalent Attachment" Includes the Linker

- Seagen argues that Defendants changed the meaning by not including the Patentee's stated example of the "covalent attachment" requirement

  *See* Seagen Opening Br. at 20.

- Adding "e.g., the linker" to Defendants' proposed construction would be fine



The terms "intracellularly cleaved" and "intracellular cleavage" refer to a metabolic process or reaction inside a cell on an [sic] Drug-Ligand Conjugate, a Drug-Linker-Ligand Conjugate, an antibody drug conjugate (ADC) or the like whereby the covalent attachment, e.g., the linker, between the drug moiety (D) and the antibody (Ab) is broken, resulting in the free drug dissociated from the antibody inside the cell.

**Defendants' Proposed Construction:** "wherein the free drug moiety dissociates from the antibody as a result of a metabolic process or reaction inside a cell in a patient that breaks the covalent attachment, of an antibody-drug conjugate or an intracellular metabolite of an antibody-drug conjugate, between the drug moiety (D) and the antibody (Ab)"

*See, e.g.,* '039 patent, 29:48-57, Claim 1.

84