**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| SEAGEN INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-cv-00337-JRG |
| | ) | |
| DAIICHI SANKYO CO., LTD., | ) | |
| | ) | █████████████ |
| Defendant, and | ) | |
| | ) | |
| ASTRAZENECA PHARMACEUTICALS | ) | |
| LP and ASTRAZENECA UK LTD., | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**DAIICHI SANKYO COMPANY, LIMITED'S MOTION FOR SUMMARY**
**JUDGMENT OF NO PROVISIONAL RIGHTS OR PRE-ISSUANCE DAMAGES**

███████████████████████████████████

## STATEMENT OF ISSUE TO BE DECIDED BY THE COURT

Whether Seagen's claim amendments during prosecution of the patent-in-suit, U.S. Patent No. 10,808,039 (the "'039 patent"), altered the claims of the originally published U.S. Patent Application No. 16/507,839 (the "'839 application") such that they are ***not substantially identical*** to the asserted claims, and therefore as a matter of law under 35 U.S.C. § 154(d), Seagen is not entitled to provisional rights and/or patent damages for any activities prior to the October 20, 2020 issuance of the '039 patent.[1]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      The '039 patent issued on October 20, 2020.

2.      Claims 1-5, 9, and 10 of the '039 patent are the only asserted claims in this case.

3.      Claim 1 of the '039 patent is an independent claim.  All other asserted claims ultimately depend from Claim 1.  (Ex. 1 at 331:35-332:66.)[2]

4.      The '039 patent issued from the '839 application, which was filed on July 10, 2019 and published on November 7, 2019.  (Ex. 1 at [21], [22], [65]; Ex. 2 at 16.)

5.      The published '839 application contained 29 patent claims, but in response to the Patent Examiner's September 4, 2019 request, on September 26, 2019, Seagen chose to proceed with only published Claims 1-19.  (Ex. 3 at 175-76; Ex. 4 at DSC_ENHERTU_00001534.)

---

[1] Plaintiff Seagen Inc. is referred to herein as "Seagen."  Defendant Daiichi Sankyo Company, Limited is referred to herein as "Daiichi Sankyo Japan."

[2] "Ex." refers to the exhibits attached to the January 6, 2022 Declaration of Preston K. Ratliff II submitted in support of Daiichi Sankyo Japan's Motion for Summary Judgment of No Provisional Rights or Pre-Issuance Damages.

6.      Claim 1 of the published '839 application reads:

An antibody-drug conjugate having the formula:



or a pharmaceutically acceptable salt thereof, wherein:
        Ab is an antibody,
        S is sulfur,
        each W is independently an Amino Acid unit,
        w is an integer ranging from 0 to 12,
        Y is a Spacer unit,
        y is 0, 1 or 2,
        D is a drug moiety, and
        p ranges from 1 to about 20, and
        wherein the antibody is attached to the drug linker compound through a
            cysteine residue of the antibody as denoted in the above formula.

(Ex. 3 at 175.)

7.      On November 6, 2019, the Patent Examiner rejected published Claims 1-19 as anticipated and/or obvious over prior art.[3]  (Ex. 4 at DSC_ENHERTU_00001532, -34-35, -37-40, -42.)

8.      On May 4, 2020, Seagen filed amendments to the claims and responded to the November 6, 2019 office action.  Seagen's claim amendments, among other things, (i) changed the "each W is independently an Amino Acid unit" and "w is an integer ranging from 0 to 12" claim limitations of published Claim 1 to "each —$W_w$— unit is a tetrapeptide; wherein each —W— unit is independently an Amino Acid unit having the formula denoted below in the square

---

[3] As published in US. Patent Publication No. 2019/0338045.

bracket:                         wherein $R^{19}$ is hydrogen or benzyl"; and (ii) changed the "wherein the antibody is attached to the drug linker compound through a cysteine residue of the antibody as denoted in the above formula" claim limitation of published Claim 1 to "wherein S is a sulfur atom on a cysteine residue of the antibody."  (Ex. 4 at DSC_ENHERTU_00001837-38, -46.)

9.      On May 20, 2020, the Patent Examiner issued another rejection of the application, finding the amended claims obvious over prior art.  (Ex. 4 at DSC_ENHERTU_00001964, -67.)

10.     On June 26, 2020, Seagen filed a response and further amended its patent claims. The amendments, among other things, introduced to Claim 1 a new limitation "wherein the drug moiety is intracellularly cleaved in a patient from the antibody of the antibody-drug conjugate or an intracellular metabolite of the antibody-drug conjugate" (the "Intracellular Cleavage Limitation").  (Ex. 4 at DSC_ENHERTU_00001994-95, -98.)

11.     In the June 26, 2020 response and claim amendment, in a section of Seagen's remarks titled "The Claims are Not Obvious over the Cited References under 35 U.S.C. § 103," Seagen argued that "in an antibody-drug conjugate, the antibody, with a drug-linker attached, must be capable of entering a cell expressing a cell-surface receptor specific for the antibody such that the drug moiety in the antibody-drug conjugate is intracellularly cleaved (as recited in ***Claim 1 as amended***)."  (Ex. 4 at DSC_ENHERTU_00001999, -2001, -2003 (emphasis added).)

12.     On July 17, 2020, the Patent Examiner issued a Notice of Allowance, allowing the pending claims (as amended by Seagen multiple times) over the previously-identified prior art "for the reasons presented in [Seagen's] arguments filed June 26, 2020."   (Ex. 4 at DSC_ENHERTU_00002011, -17.)

13.   Claim 1 of the issued '039 patent reads:

An antibody-drug conjugate having the formula:



or a pharmaceutically acceptable salt thereof, wherein:

Ab is an antibody,
S is sulfur,
each —$W_w$— unit is a tetrapeptide; wherein each —W— unit is
    independently an Amino Acid unit having the formula denoted below
    in the square bracket:

wherein $R^{19}$ is hydrogen or benzyl,
Y is a Spacer unit,
y is 0, 1 or 2,
D is a drug moiety, and
p ranges from 1 to about 20,
wherein the S is a sulfur atom on a cysteine residue of the antibody, and
wherein the drug moiety is intracellularly cleaved in a patient from the
    antibody of the antibody-drug conjugate or an intracellular metabolite
    of the antibody-drug conjugate.

(Ex. 1 at 331:36-332:40.)

███████████████████████████████████████

## ARGUMENT

On November 7, 2017, Daiichi Sankyo Japan was granted U.S. Patent No. 9,808,537 covering the Accused Product in this case, DS-8201.[4]  Further, on December 18, 2018 and February 5, 2019, respectively, Daiichi Sankyo Japan was granted U.S. Patent Nos. 10,155,821 and 10,195,288 also covering the Accused Product DS-8201.[5]  On December 20, 2019, the FDA granted Daiichi Sankyo Japan's subsidiary, non-party Daiichi Sankyo Inc., approval to sell the Accused Product in the United States, and Daiichi Sankyo Inc. began selling the Accused Product in the United States in early January 2020.[6]  More than nine months after all those pioneering developments and accomplishments, and more than six-and-half years after Daiichi Sankyo Japan filed its priority patent application disclosing the Accused Product on October 11, 2012, Seagen filed its '839 application on July 10, 2019, which issued as the '039 patent on October 20, 2020 after multiple claim amendments.  This case concerns that single asserted patent.

Seagen's originally presented claims were repeatedly denied as, among other things, obvious over prior art, requiring Seagen to make two rounds of claim amendments before the claims were allowed and issued.  Seagen asserts a claim for provisional rights and pre-issuance damages for the period between publication of the original '839 application on November 7, 2019 and issuance of the '039 patent on October 20, 2020.  As a matter of law, patentees may only reach back to allege infringement and seek damages for such pre-issuance periods if the issued patent claims are "substantially identical" to the claims in the original published patent application. 35 U.S.C. § 154(d).  Here, they are not.

---

[4] (Ex. 5 at 20:2-13, 21:13-22:8.)

[5] (Ex. 5 at 26:20-29:15.)

[6] (Ex. 6 at DSC_ENHERTU_00011475.)

Between the original published application and the issued patent-in-suit, Seagen made two rounds of amendments to Claim 1, each of which constitutes a substantive change that renders the issued claim not substantially identical to the published claim (and, because all of the other asserted claims depend from Claim 1, they likewise all are not substantially identical to published claims). In the first round, Seagen amended Claim 1 to narrow a claim limitation that originally required just "an Amino Acid unit" to now requiring a ***tetrapeptide*** with amino acid units ***of a particular formula involving glycine or phenylalanine***.  Also in the first round, Seagen further amended Claim 1 to specify a single location for the sulfur atom (S), whereas the published application version of Claim 1 encompassed subject matter with at least two potential locations for that sulfur atom (S).  In the second round, Seagen amended Claim 1 to include the limitation "wherein the drug moiety is intracellularly cleaved in a patient from the antibody of the antibody-drug conjugate or an intracellular metabolite of the antibody-drug conjugate" (the Intracellular Cleavage Limitation).  This limited the claimed subject matter in all of the '039 patent's claims to one in which the drug moiety is cleaved intracellularly and *in vivo*, whereas the published application version of Claim 1 encompassed subject matter in which the drug moiety could be cleaved, at least partially, extracellularly.

These were thus narrowing amendments, which independently and collectively render the issued claims of the '039 patent (including Claim 1 and all of the other asserted claims, which depend from Claim 1) not substantially identical to the published claims of the '839 application. Accordingly, Daiichi Sankyo Japan requests that the Court grant this Motion and enter summary judgment that Seagen is not entitled to provisional rights or any pre-issuance damages even if the patent-in-suit is found to be valid, enforceable, and infringed.

██████████████████████████

## I.   LEGAL STANDARDS

### A.   <u>Summary Judgment</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the initial burden of identifying the basis for granting summary judgment and identifying evidence demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party opposing summary judgment may not rest upon mere allegations and must identify specific evidence in the record that supports its claim. *See Anderson*, 477 U.S. at 249-50.  Entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.

Summary judgment is appropriate where the issue is a question of law and the movant is entitled to judgment as a matter of law.  *See Int'l Ass'n of Machinists v. Texas Steel Co.*, 538 F.2d 1116, 1119 (5th Cir. 1976); *see also Rosebud LMS Inc. v. Adobe Sys. Inc.*, 812 F.3d 1070, 1075-76 (Fed. Cir. 2016) (affirming district court's grant of summary judgment on claim for pre-issuance damages).

### B.   <u>Provisional Rights and Pre-Issuance Damages</u>

A patent owner may obtain a reasonable royalty for infringement during the period from publication of the patent application to issuance of the patent only if "the invention as claimed in the patent is substantially identical to the invention as claimed in the published patent application."

35 U.S.C. § 154(d)(1), (2).[7]   "[C]laims are 'identical' to their original counterparts if they are 'without substantive change.'"   *Innovention Toys, LLC v. MGA Entm't, Inc.*, 611 F. App'x 693, 699 (Fed. Cir. 2015), *vacated*, 136 S. Ct. 2483 (2016), *remanded to* 667 F. App'x 992, 993 (Fed. Cir. 2016) (reinstating 2015 opinion on provisional right issue) (quoting *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998) (reexamination and reissue contexts) (*Laitram II*)).

Whether issued patent claims are "substantially identical" to published application claims is a matter of claim construction and thus an issue of law that is exclusively within the jurisdiction of the Court to decide.   *See Laitram II*, 163 F.3d at 1347 (explaining "the interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law, exclusively for the court" (internal quotation marks omitted)); *R+L Carriers, Inc. v. Qualcomm, Inc.*, 801 F.3d 1346, 1349-50 (Fed. Cir. 2015) ("Because we are reviewing the scope of the reexamined and original claims, this is a matter of claim construction.").

"To determine whether a claim change is substantive it is necessary to analyze the claims of the original [application] and the [issued] patents in light of the particular facts, including the prior art, the prosecution history, other claims, and any other pertinent information."   *Laitram Corp. v. NEC Corp.*, 952 F.2d 1357, 1362–63 (Fed. Cir. 1991) (*Laitram I*).   In the context of this analysis, amendments resulting in the allowance of claims that had been rejected over prior art is "a highly influential piece of prosecution history."   *Laitram II*, 163 F.3d at 1348.   Indeed, "it is

---

[7] Provisional rights and pre-issuance damages also require showing the alleged infringer had "actual notice of the published patent application."   35 U.S.C. § 154(d)(1)(B).   This Motion relates only to the "substantially identical" prong, as it is both dispositive and a question of law well-suited for summary judgment.   Although not the subject of this Motion, Daiichi Sankyo Japan disputes that it had actual notice of the published patent application and, if it did have actual notice, **when** it obtained such actual notice.   Daiichi Sankyo Japan reserves all rights to present arguments, evidence, and defenses as to that issue at trial or otherwise during these proceedings.

████████████████████████████████████

difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment." *Id*.  Thus, in such circumstances where an amendment renders allowable a claim that had been rejected over prior art, the courts' analyses frequently result in a determination that the issued claims are not "substantially identical" to the published claims. *See*, *e.g.*, *R+L Carriers*, 801 F.3d at 1351.[8]

An analytical framework the Federal Circuit has employed in conducting this analysis is that an amended claim is narrower (and thus not substantially identical) if "there is any product or process that would infringe the original claim, but not infringe the amended claim." *R+L Carriers*, 801 F.3d at 1350.

## II.   THE ASSERTED CLAIMS ARE NOT SUBSTANTIALLY IDENTICAL TO THE PUBLISHED CLAIMS, AND SO THERE CAN BE NO PROVISIONAL RIGHTS OR PRE-ISSUANCE DAMAGES

The claims recited in the '839 application were rejected multiple times by the Patent Examiner as obvious over prior art.  (*See* Statement of Undisputed Material Facts ("UMF") ¶¶ 7, 9.)  Seagen had to amend its claims multiple times before they were allowed and the '039 patent issued.  (UMF ¶¶ 8, 10-12.)  Those amendments substantively changed and, in particular, narrowed the scope of Seagen's claims, thus rendering the issued claims not substantially identical to the

---

[8] *See also*, *e.g.*, *Capella Photonics, Inc. v. Fujitsu Network Commc'ns, Inc.*, 2021 WL 2810078, at *3 (E.D. Tex. Feb. 27, 2021) (in Report and Recommendation, Magistrate Judge holding "[i]t is clear from the narrowing amendment that the Asserted Claims are not substantially identical to the Original Claims"); *Abbey v. Robert Bosch GMBH*, 217 F.3d 853, 1999 WL 819683, at *3 (Fed. Cir. Oct. 6, 1999) (finding claims not substantially identical where patentee "added limitations . . . so that the claim covers only a particular type of" item, and emphasizing the patentee "amended the claim in response to a prior art rejection"); *Neupak, Inc. v. Ideal Mfg. & Sales Corp.*, 41 F. App'x 435, 444 (Fed. Cir. 2002) (finding claims not substantially identical where prosecution history indicated addition of word in amended claim was to distinguish it over the prior art); *Yoon Ja Kim v. Earthgrains Co.*, 451 F. App'x 922, 925-26 (Fed. Cir. 2011) (finding amendment from "consisting essentially of" to "consisting of" to be a substantive change, and asking "Why, if the claims are of identical scope, did [the patentee] amend them?").

published claims.   The change is illustrated by the following side-by-side comparison of the original published Claim 1 from the '839 application and the ultimate issued Claim 1 from the '039 patent (additions are shown in blue, deletions are shown in red, and the three changes are labeled):

| Published Claim 1 | Issued Claim 1 |
|---|---|
| An antibody-drug conjugate having the formula:<br><br><br><br>or a pharmaceutically acceptable salt thereof, wherein:<br>    Ab is an antibody,<br>    S is sulfur,<br><br><br>    each W is independently an Amino Acid unit,<br>    w is an integer ranging from 0 to 12, | An antibody-drug conjugate having the formula:<br><br><br><br>or a pharmaceutically acceptable salt thereof, wherein:<br>    Ab is an antibody,<br>    S is sulfur,<br><br>    each $—W_w—$ unit is a tetrapeptide; wherein each $—W—$ unit is independently an Amino Acid unit having the formula denoted below in the square bracket:<br><br><br><br>wherein $R^{19}$ is hydrogen or benzyl,<br>w is an integer ranging from 0 to 12, |
| Y is a Spacer unit,<br>y is 0, 1 or 2,<br>D is a drug moiety, and<br>p ranges from 1 to about 20, and | Y is a Spacer unit,<br>y is 0, 1 or 2,<br>D is a drug moiety, and<br>p ranges from 1 to about 20, and |

**Change 1**

- 10 -

| | | |
|---|---|---|
| **Change 2** | wherein the antibody is attached to the drug linker compound through a cysteine residue of the antibody as denoted in the above formula. | wherein the ~~antibody is attached to the drug linker compound through~~ <u>S is a sulfur atom on</u> a cysteine residue of the antibody ~~as denoted in the above formula~~<u>., and</u> |
| **Change 3** | | <u>wherein the drug moiety is intracellularly cleaved in a patient from the antibody of the antibody-drug conjugate or an intracellular metabolite of the antibody-drug conjugate.</u> |

(UMF ¶¶ 6, 13.)  Because Claim 1 is an independent claim, and all of the other asserted claims depend from Claim 1, these changes to Claim 1 flow through to the other asserted claims as well.

> **A.    Seagen's Amendment to Claim 1 Narrowing "An Amino Acid Unit" to a Tetrapeptide with Amino Acid Units of a Particular Formula Was a Substantive Change <u>Rendering Issued Claim 1 Not Substantially Identical to the Published Claim</u>**

Seagen's amendment changing the language in Claim 1 from stating "each W is independently an Amino Acid unit" and "$w$" being an integer ranging from 0 to 12, to language reciting more specifically that each "$W_w$" is a ***tetrapeptide*** with amino acid units ***of a particular formula involving glycine or phenylalanine*** ("Change 1" in the chart *supra*) was a substantive (and narrowing) change.

In the published Claim 1, "W" is defined to be "an Amino Acid unit" without any specification or limitation on what amino acid(s) that can be, while "$w$" is an integer ranging from 0 to 12.  Seagen's amendment of that language significantly narrowed that claim limitation, limiting it to tetrapeptides (i.e., excluding dipeptides, tripeptides, etc.) and further limiting it to tetrapeptides having amino acids of the particular formula involving glycine or phenylalanine set forth in the issued Claim 1.

███████████████████████████████████████

Seagen's amendment limiting the possible amino acids thus narrowed the scope of the claim to get around prior art, meaning it was a substantive change rendering the issued claim not substantially identical to the original published claim.  *See R+L Carriers*, 801 F.3d at 1351.

**B.**    **Seagen's Amendment Adding a Limitation on the Location of the Sulfur Atom (S) Was a Substantive Change <u>Rendering Issued Claim 1 Not Substantially Identical to the Published Claim</u>**

Seagen's amendment changing the language in Claim 1, "wherein the antibody is attached to the drug linker compound through a cysteine residue of the antibody as denoted in the above formula," to "wherein the S is a sulfur atom on a cysteine residue of the antibody," ("Change 2" in the chart *supra*) was another substantive (and narrowing) change.

The specifications accompanying the '839 application indicate that the original published language encompassed two different structures:  (i) a structure where the sulfur atom (S) is a part of the drug linker compound and the antibody is attached to S through a cysteine residue (i.e., an S-S structure), (*see* Ex. 3 at [0568], [0677], [0733]-[0734]); and (ii) a structure where S is just part of the antibody (i.e., S refers to the sulfur atom of the antibody's cysteine residue), (*see id*. at [0694]).  In other words, based on the language of the published claim and the specifications, the "S" in the formula could either be part of the drug linker or part of the antibody's cysteine residue. When Seagen amended and narrowed the language to specify "the S is a sulfur atom on a cysteine residue of the antibody," it ruled out the first of those structures and limited the claim to the second structure.

Seagen's amendment specifying the location of the sulfur atom "S" thus narrowed the scope of the claim to get around prior art, meaning it was a substantive change rendering the issued claim not substantially identical to the original published claim.  This is another independent basis supporting a summary judgment that Seagen cannot seek provisional rights or pre-issuance

damages.  *See R+L Carriers*, 801 F.3d at 1351.

**C.    Seagen's Amendment Adding the Intracellular Cleavage
Limitation to Claim 1 Was a Substantive Change Rendering
<u>Issued Claim 1 Not Substantially Identical to the Published Claims</u>**

The addition of the Intracellular Cleavage Limitation to Claim 1 ("Change 3" in the chart
*supra*) was yet another substantive (and narrowing) change.  In particular, the inclusion of that
additional limitation introduced requirements that were not previously present in the published
application claim; namely, that the cleavage of the drug moiety occur within cells (i.e.,
intracellularly) and that it also occur within a patient (i.e., *in vivo*).  The amendment was thus
narrowing and so constitutes a substantive change.

Notably, the amendment adding the Intracellular Cleavage Limitation to Claim 1 was not
"a mere clarification of language to make specific what was always implicit or inherent" for an
antibody-drug conjugate.  *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 828
(Fed. Cir. 1984).  The original (dependent) Claim 14 and specification [0272] stated that "a
substantial amount of the drug moiety is not cleaved from the antibody until the antibody-drug
conjugate compound enters a cell with a cell-surface receptor specific for the antibody of the
antibody-drug conjugate, and the drug moiety is cleaved from the antibody when the antibody-
drug conjugate does enter the cell."  (Ex. 3 at [0272], 175.)  That does not include any limitation
that the cleavage occurs in cells *within a patient*.  Moreover, the statement in that published
dependent Claim 14 that "*a substantial amount*," rather than "all," of the drug moiety "is not
cleaved from the antibody until the antibody-drug conjugate compound enters a cell" means that
published dependent Claim 14 (and the published independent Claim 1 from which it depends)
contemplated and encompassed some cleavage occurring extracellularly.  The issued Claim 1
including the Intracellular Cleavage limitation forecloses any such extracellular and non-*in vivo*

- 13 -

cleavage, and so it was a narrowing amendment and thus a substantive change rendering the original Claim 1 not substantially identical to the issued Claim 1.

Indeed, Seagen emphasized this intracellular cleavage point in its arguments to get past the prior art (which formed the basis for the Examiner allowing the second amended claims to issue). In responding to the Examiner's Second Rejection, Seagen argued:  "in an antibody-drug conjugate, the antibody, with a drug-linker attached, must be capable of entering a cell expressing a cell-surface receptor specific for the antibody such that the drug moiety in the antibody-drug conjugate is intracellularly cleaved (as recited in Claim 1 as amended)."  (UMF ¶¶ 10-12.)

Seagen thus made a narrowing amendment to get around the prior art when it added the Intracellular Cleavage Limitation, and the Patent Examiner agreed and allowed the claims to issue as a result of that amendment.  Seagen cannot seek provisional rights or pre-issuance damages under these circumstances.  *See R+L Carriers*, 801 F.3d at 1351.

### D. The Opinion of Seagen's Expert Witness Does Not Compel a Contrary Conclusion or Defeat Summary Judgment

Whether the issued claims are substantially identical to the published claims is a matter of claim construction and a question of law that is exclusively within the purview of the Court (not a jury) to decide.  *See Laitram II*, 163 F.3d at 1347; *R+L Carriers*, 801 F.3d at 1349-50.  Seagen's expert witness, Carolyn Bertozzi, Ph.D., opined in her November 22, 2021 corrected expert report that the issued claims of the patent-in-suit are substantially identical to the claims of the '839 application.  (*See* Ex. 7 ¶¶ 169-174.)  Dr. Bertozzi's opinion on this legal issue, however, does not create any basis for denying summary judgment or deferring the issue to trial.  This is because Dr. Bertozzi should be given no deference on this question of law and claim construction.

Further, Dr. Bertozzi's analysis actually confirms that the issued claims are ***not*** substantially identical to the published claims.

*See, e.g., Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1329-30 (Fed. Cir. 2004) (doctrine of claim differentiation creates "a presumption that each claim in a patent has a different scope" (internal quotation marks omitted)); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."); *Koninklijke KPN N.V. v. Samsung Elecs. Co.*, Nos. 2:14-CV-1165-JRG, 2:15-CV-948-JRG, 2016 WL 2610649, at *20-22, 24 (E.D. Tex. May 6, 2016) (applying claim differentiation principle in construing claims); *Biosonix, LLC v. Hydrowave, LLC*, 230 F. Supp. 3d 598, 607-09 (E.D. Tex. 2017) (explaining "claim differentiation teaches that two claims of a patent are presumptively of different scope" and that the principle is at its strongest between independent and dependent claims).  So, importing a portion of one dependent claim into an independent claim means adding something substantively different, and thus making a substantive change, to the independent claim.

Dr. Bertozzi's opinion is further incorrect and fails to defeat summary judgment for

---

[9] Published Claim 2 included only the limitation requiring amino acids with a specific formula involving glycine or phenylalanine, published Claim 5 included only the limitation requiring a tetrapeptide, and published Claim 17 included only the Intracellular Cleavage Limitation.  (Ex. 3 at 175.)

multiple reasons.

First, the importation of narrowing limitations previously relegated to separate individual dependent claims into the sole independent claim constitutes a substantive change, even if the literal language of those limitations is not significantly altered in so importing.  For example, the Intracellular Cleavage Limitation, *see* Section II.C, *supra*, was confined to dependent Claim 17 in the '839 application.  That published dependent Claim 17 depended only from published Claim 1, and no other published claims depended from Claim 17.  (Ex. 3 at 175.)  So, published Claim 1 was broader than Claim 17's limitations, and the Intracellular Cleavage Limitation *only* applied to a single, dependent claim (published Claim 17).  By contrast, in the issued '039 patent, the Intracellular Cleavage Limitation is incorporated in the sole independent claim, Claim 1, thus limiting Claim 1 and *all other claims of the patent*.

It is illustrative to apply the framework enunciated in *R+L Carriers*, that an amendment is narrowing if something would have infringed the published claim but not the issued claim.  801 F.3d at 1350.  Here, if an antibody-drug conjugate met all of the claim elements of published Claim 1 but did *not* include the aspect that the drug moiety is intracellularly cleaved in a patient from the antibody of the antibody-drug conjugate (or an intracellular metabolite thereof), then that drug would infringe published Claim 1 but *not* issued Claim 1.[10]  That confirms that issued Claim 1 (and the other asserted claims, which all depend from Claim 1) is narrower than, and thus not substantially identical to, the published claims.

Second, the amendment limiting S to being on the antibody's cysteine residue (i.e., the

---

[10] Likewise, if an antibody-drug conjugate met all of the claim limitations of published Claim 17 but did *not* include a tetrapetride with amino acid units of the specific formula set forth in issued Claim 1, then that antibody-drug conjugate would infringe published Claim 17 but *not* issued Claim 1.

██████████████████████████████████████████

amendment changing "wherein the antibody is attached to the drug linker compound through a cysteine residue of the antibody as denoted in the above formula," to "wherein the S is a sulfur atom on a cysteine residue of the antibody," labeled "Change 2" in the chart *supra*, *see* Section II.B, *supra*), did not come from published Claims 2, 5, 17, or any of the other published claims. (*See* Ex. 3 at 175.)   Thus, even if Dr. Bertozzi's opinion—████████████████████████

████████████████████████████████████████████

██████████████████████—were correct (which it is not), it completely fails to account for or address that substantive change rendering the issued and published claims not substantially identical.

### E.   Seagen's Substantive Changes to Claim 1 Carry Through to All of the Other Asserted Claims

As detailed in the preceding Sections, Seagen made multiple substantive changes to Claim 1 to get around prior art.  The changes, both independently and collectively, render the issued claims not substantially identical to the published claims.

Claim 1 is the only independent claim of the patent-in-suit, and all of the other claims (and, thus, all of the other asserted claims in this case) ultimately depend from Claim 1.  (UMF ¶¶ 2-3.) As such, the substantive changes to Claim 1 also impact and carry through to the other asserted claims, meaning they likewise are not substantially identical to the published claims.

As discussed above, Seagen's expert witness notes that issued Claim 1 incorporates claim limitations from published Claims 2 (only amino acids with glycine or phenylalanine), 5 (only a tetrapeptide), and 17 (only intracellular cleavage) into published Claim 1.  The '839 application, however, does not anywhere include a published claim with that full combination of published Claims 1 + 2 + 5 + 17; it contains published Claim 1, published Claims 1 + 2, published Claims 1 + 2 + 5, and published Claims 1 + 17, but not the combination of published Claims 1 + 2 + 5 + 17.

(*See* Ex. 3 at 175-76.)   Further, as discussed above, no published claim includes the limitation present in issued Claim 1 specifying the location of the "S" sulfur atom ("Change 2" in the chart *supra*).   Accordingly, no independent or dependent published claim is substantially identical to any independent or dependent issued claim.

For example, issued Claim 2 is a dependent claim that depends from issued Claim 1 and reads:  "The antibody-drug conjugate of claim 1, wherein Y is a self-immolative spacer."  (Ex. 1 at 332:41-42.)  While the '839 application has dependent claims that similarly add the limitation "wherein Y is a self-immolative spacer," the independent claim from which those dependent claims depend is not substantially identical to issued Claim 1, and so the dependent claims also are not substantially identical, notwithstanding their similarity in language.  The following chart illustrates the difference:

| Published Claim 8 ("The antibody-drug conjugate of claim 5, wherein Y is a self-immolative spacer.")[11] | Issued Claim 2 ("The antibody drug conjugate of claim 1, wherein Y is a self-immolative spacer.")[12] |
|---|---|
| Published Claim 8 depends from published Claim 5, which in turn depends from published Claim 2, which in turn depends from published Claim 1, so published Claim 8 effectively reads: | Issued Claim 1 includes limitations from published Claims 2, 5, and 17, plus the limitation specifying the location of "S," and issued Claim 2 depends from issued Claim 1, so issued Claim 2 effectively reads: |

---

[11] (Ex. 3 at 175.)

[12] (Ex. 1 at 332:41-42.)

| | |
|---|---|
| Published Claim 1 limitation<br>+<br>Published Claim 2 limitation (only amino acids with glycine or phenylalanine)<br>+<br>Published Claim 5 limitation (only a tetrapeptide)<br>+<br><br><br><br><br><br>"Wherein Y is a self-immolative spacer." | Published Claim 1 limitation<br>+<br>Published Claim 2 limitation (only amino acids with glycine or phenylalanine)<br>+<br>Published Claim 5 limitation (only a tetrapeptide)<br>+<br>Published Claim 17 limitation (only intracellular cleavage)<br>+<br>Limitation specifying location of "S"<br>+<br>"Wherein Y is a self-immolative spacer." |

This same analysis applies to all of the other asserted claims of the '039 patent.  For example, the following chart illustrates the analysis for issued Claim 3, which reads "The antibody-drug conjugate of claim 2, wherein y is 1":

| Published Claim 9<br>("The antibody-drug conjugate of claim 8, wherein y is 1.")[13] | Issued Claim 3<br>("The antibody drug conjugate of claim 2, wherein y is 1.")[14] |
|---|---|
| Published Claim 9 depends from published Claim 8, which in turn depends from published Claim 5, which in turn depends from published Claim 2, which in turn depends from published Claim 1, so published Claim 8 effectively reads: | Issued Claim 1 includes limitations from published Claims 2, 5, and 17, plus the limitation specifying the location of "S," and issued Claim 3 depends from issued Claim 2, which in turn depends from issued Claim 1, so issued Claim 3 effectively reads: |

---

[13] (Ex. 3 at 175.)

[14] (Ex. 1 at 332:43-44.)

| | |
|---|---|
| Published Claim 1 limitation<br>+<br>Published Claim 2 limitation (only amino acids with glycine or phenylalanine)<br>+<br>Published Claim 5 limitation (only a tetrapeptide)<br>+ | Published Claim 1 limitation<br>+<br>Published Claim 2 limitation (only amino acids with glycine or phenylalanine)<br>+<br>Published Claim 5 limitation (only a tetrapeptide)<br>+<br>Published Claim 17 limitation (only intracellular cleavage)<br>+<br>Limitation specifying location of "S"<br>+ |
| "Wherein Y is a self-immolative spacer"<br>+<br>"Wherein y is 1." | "Wherein Y is a self-immolative spacer"<br>+<br>"Wherein y is 1." |

Thus, all of the asserted claims (independent and dependent) are not substantially identical to any of the published claims of the '839 application.

## CONCLUSION

For the foregoing reasons, Daiichi Sankyo Japan respectfully requests this Court grant this Motion and enter summary judgment for Daiichi Sankyo Japan that Seagen cannot claim or seek provisional rights or pre-issuance damages.

Dated: January 6, 2022

Respectfully submitted,

/s/ *Preston K. Ratliff II*

Deron R. Dacus
State Bar No. 00790553
The Dacus Firm, P.C.
821 ESE Loop 323, Suite 430
Tyler, Texas, 75701
+1 (903) 705-1117
+1 (903) 581-2543 facsimile
ddacus@dacusfirm.com

J. Mark Mann
State Bar No. 12926150
mark@themannfirm.com
MANN | TINDEL | THOMPSON
300 West Main Street
Henderson, Texas 75652
(903) 657-8540
(903) 657-6003 (fax)

*Attorneys for Defendant Daiichi Sankyo Company,*
*Limited*

OF COUNSEL:

Preston K. Ratliff II
Joseph M. O'Malley, Jr.
Ashley N. Mays-Williams
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Jeffrey A. Pade
Paul Hastings LLP
2050 M Street NW
Washington, DC 20036
(202) 551-1700

*Attorneys for Defendant Daiichi Sankyo Company,*
*Limited*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who have consented to electronic service are being served with a copy of this document via electronic mail on January 6, 2022.

/s/ Preston K. Ratliff II